Joseph S. STEPHENSON, Appellant,

v.

UNITED STATES, Appellee.

No. 6015.

District of Columbia Court of Appeals.

Argued March 15, 1972.

Decided Nov. 10, 1972.

———◆———

Charles A. Kubinski, Washington, D. C., for appellant.

Robert E. L. Eaton, Jr., Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Charles E. Brookhart, Asst. U. S. Attys., were on the brief, for appellee.

Before REILLY, Chief Judge, and KERN and GALLAGHER, Associate Judges.

KERN, Associate Judge:

The sole issue in this appeal is the lawfulness of a police stop and frisk of appellant which uncovered incriminatory items resulting in his immediate arrest and his later trial for and conviction of burglary. Our decision necessarily rests upon the facts leading up to the confrontation between the police and appellant and what occurred during that encounter.

Two police officers, each in his own cruiser with motor idling, were parked at 4:30 in the morning facing south on 10th Street toward H Street in the northwest section of the city. Having observed almost no people and little activity up to that time, they suddenly saw appellant and another man running at a "brisk jog" across 10th and around the corner eastward on H. One of the officers had recently been briefed about a series of roof-top burglaries that were occurring in the "downtown" area. The officers, still in their cars, followed the two men who slowed to a walk, and then drove their cruisers on separate driveways across the H Street sidewalk so as to place appellant and his companion between them.

One of the officers, remaining in his vehicle which was about three feet from appellant, asked where they had been and was told "the clubs". *The officer knew that the clubs had closed more than two hours earlier at 2 a. m.* He asked them where they were going and was told they were going "home" to an address in *southeast* Washington. The officer, noticing a bulge in the pocket of appellant's companion, asked what he had and was told that it was "change" from gambling and was shown a considerable amount of silver. The officer, after alighting from his car, saw a "Phillips" screwdriver, blade up, sticking out of appellant's coat, which he considered a weapon and seized.

All the witnesses at the hearing on appellant's pretrial suppression motion agreed that at that point a call came over the radio of one of the cruisers reporting a burglary in progress several blocks away.[1]

The officer who had questioned appellant radioed that he had two suspects and was directed by the dispatcher to bring them to the scene of the burglary—on 11th Street between H and G Streets, N.W. There, two stores had been broken into and the vending machine in one rifled. An attempt at tearing off the bars from a third

---

1. Appellant and his codefendant at the pre-trial hearing gave a slightly different version than the officers of what had oc-   curred up to the point of that radio call. The trial court in denying the motion to suppress credited the officers' testimony.

store's back window had been made, but that store's owner, who lived on the premises, had called the police for help and thereby thwarted the break in. The police searched appellant's companion at headquarters and found in his coat pocket $191 in silver coins.

Appellant in his challenge to his conviction concerns himself only with those events between the time the officers saw him running on 10th Street and the time the report of the burglary came over the police car radio. He argues strenuously that the police had no right either (1) to stop his companion and him on a public street and question them, or (2) to seize the screwdriver from him. Therefore, he urges that *both* the silver coins, which were revealed during the police stop for questioning, *and* the screwdriver, which the officer seized from him, should have been barred from evidence at the trial. We disagree for the following reasons.

In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court for the first time focused specifically on the long-established police practice of stopping suspiciously acting persons on the street for the purpose of questioning them and, when required, searching them for dangerous weapons. Until that decision, courts usually considered that the issue raised by a forcible on-the-street stop of a citizen by the police for questioning was whether an arrest had occurred and, if so, whether there was probable cause for such arrest. La Fave, "Street Encounters" and the Constitution: Terry, Sibron, Peters, And Beyond, 67 Mich.L.Rev. 43–44 (1968); Remington, The Law Relating to "On the Street" Detention, 51 J.Crim. 386, 390 (1960).[2] Prior to *Terry* a stop merely for questioning had not been thought to raise constitutional issues. *E. g.,* Brook v. United States, D.C.Mun.App., 159 A.2d 876, 879 (1960).

In *Terry, supra,* 392 U.S. at 19, 88 S.Ct. 1868, the Court recognized that when an officer stopped a person, either by physical force or show of authority, even if only to ask questions, this action nevertheless constituted a "seizure" within the meaning and protection of the fourth amendment. The Court further recognized that merely patting down that person's outer clothing for weapons solely for the inquiring officer's protection was still a "search," also within the meaning and protection of the fourth amendment. The Supreme Court concluded that the issue for determination in these so-called "stop and frisk" cases is not whether an arrest has taken place but whether the *officer's conduct under all the circumstances is reasonable,* so as to comply with the fourth amendment requirement of reasonableness. *Terry, supra,* 392 U.S. at 21, 22, 88 S.Ct. 1868. The Court said (at 18 n. 15, 88 S.Ct. at 1878):

In our view the sounder course is to recognize that the Fourth Amendment

2. A major consideration in determining whether a person stopped for questioning had been placed under arrest was whether he could ignore the officer's inquiries and proceed on his way. Judge Leventhal, in his concurring opinion in Bailey v. United States, 128 U.S.App.D.C. 354, 364–365, 389 F.2d 305, 315–316 (1967), observed:

[I]n the stop situation, I think it unwise to focus on whether the detained person feels "free to go." As a realistic matter, there can be no casual disregard of on-the-street police questioning. People generally do not know and usually do not care whether they have a lawful right to walk away without regard for the presence of the policeman. . . . People who are stopped for some questions generally stay stopped until the police indicate they can go. . . .

. . . . .

. . . In the overwhelming number of cases, the police do nothing more than walk or drive up and ask questions. That is no arrest. . . . Obviously, the hard questions . . . can only be evaluated by looking, as in so many other Fourth Amendment questions, to the reasonableness of the police conduct. . . . (Footnote omitted.)

governs *all intrusions by agents of the public upon personal security,* and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness. . . . (Emphasis added.)

■ Appellant contends that to uphold the stop for questioning in this case is thereby to place a person's right to move about freely at the mercy of a police officer's hunch or whim. *See generally,* Gomez v. Wilson, 323 F.Supp. 87 (D.D.C.1971); Reich, Police Questioning of Law Abiding Citizens, 75 Yale L.J. 1161 (1966). However, the Court in *Terry* was careful to hold (at 21, 88 S.Ct. at 1880) that an officer may stop and question only where he can "point to *specific and articulable facts* which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Footnote omitted, emphasis added.)

■ In Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Supreme Court in reaffirming its decision in *Terry,* said (at 145–146, 92 S.Ct. at 1923):

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of *the facts known to the officer at the time.*[3] (Emphasis added, citations omitted.)

Whether there are "specific and articulable facts" to justify a stop for questioning is an issue of course which must be carefully scrutinized in the cases brought to our courts. The Supreme Court in *Terry* noted (392 U.S. at 15, 88 S.Ct. at 1876):

Nothing we say today is to be taken as indicating approval of police conduct outside the legitimate investigative sphere. Under our decision, courts still retain their traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires.

Our prior "stop and frisk" decisions, which are collected in the Appendix to this opinion, have unfailingly considered certain factors in determining whether an on-the-street stop for questioning by a police officer was reasonable. These are: (1) the particular activity of the person stopped for questioning which the investigating officer has observed, (2) that officer's knowledge about (a) the activity and the person observed and/or (b) the area in which the activity is taking place, and (3) the immediate reaction or response of the person approached and questioned by the officer.[4]

3. Professor La Fave suggests;
. . . [A] reasonably specific statement by an officer of the circumstances underlying his action—when considered together with how he in fact reacted to the situation which confronted him— should afford an adequate basis for judicial review. (Footnote omitted.) ["Street Encounters" and the Constitution: Terry, Sibron, Peters, And Beyond, 67 Mich.L.Rev. 40, 72 (1968).]

4. It is suggested that legislative fiat, rather than case-by-case development, would more clearly and comprehensively delimit the metes and bounds of proper police action and rights of citizens. Also, legislation or regulation would in practical effect enable police conduct to be monitored and, where found improper, punished. La Fave, "Street Encounters" and the Constitution: Terry, Sibron, Peters, And Beyond, 67 Mich.L.Rev. 40, 45–46 (1968).
Interestingly, the Uniform Arrest Act, adopted in 1942 and presently in force in three states [R.I.Gen.Laws Ann. §§ 12–7–1 through 13 (1956); N.H.Rev.Stat. Ann. §§ 594:1–594:25 (1955); Del.Code Ann. tit. 11, § 1901–1912 (1953)] authorizes a peace officer to "stop any person [for not more than 20 minutes] . . . who he has reasonable ground to suspect is committing, has committed

In the instant case, the officer saw two men *running* in a downtown commercial area where the mere presence of anyone at that early morning hour would have been unusual. *See* Onofre v. State, 474 S.W.2d 699 (Tex.Cr.App.1972); Anderson v. State, 123 Ga.App. 57, 179 S.E.2d 286 (1970). He knew that a series of crimes with a specific *modus operandi, i. e.,* roof-top burglary, had been committed in the area in which they were running and he was patrolling. In our view, the specific activity he had observed "downtown" at that time, together with his knowledge of prior crimes in that particular area, warranted a reasonable belief that criminal activity might have been afoot and justified his intrusion, *i. e.,* stopping the two men and questioning them as to their prior whereabouts. When their response to this initial question was a patent untruth he had reason (a) to inquire further as to where they were going and what appellant's companion had bulging in his pocket and (b) to remove from appellant's pocket the pointed screwdriver. The further questioning was quite brief and the seizure of the implement was reasonable under the circumstances. Not only did the officer testify that he took such action for his own safety, *compare* Gray v. United States, D.C. App., 292 A.2d 153 (1972), but the record contains support for his belief that appellant might be dangerous. Burglary is a serious crime often involving violence; there were but two officers arrayed against appellant and his companion in the dead of night on a deserted street; and, the screwdriver, considering its length and type of blade, was capable of being used to inflict physical injury. The screwdriver was in the outer clothing of appellant so that the officer's search was limited as *Terry* requires.[5]

In sum, we are satisfied that the seizure was a frisk for protection, not a fishing for evidence, which the Supreme Court has expressly condemned in Adams v. Williams, *supra,* and the Metropolitan Police Department has cautioned against in its "stop and frisk" guidelines for the force.[6]

Affirmed.

---

or is about to commit a crime, and may demand of him his name, address, business abroad and whither he is going." It further provides that the "officer may search for a dangerous weapon any person whom he has stopped . . . to question . . . whenever he has reasonable ground to believe that he is in danger if the person possesses a dangerous weapon." *Id.* at 43 n. 15 citing Interstate Comm. on Crime, Interstate Crime Control 86–89 (1942).

The American Law Institute has made efforts to codify guidelines for police stops for questioning. *Id.* at 44 n. 22 citing Model Code of Pre-Arraignment Procedure § 2.02 (Tent.Draft No. 4, 1971).

5. The Court said in *Terry* (392 U.S. at 30, 88 S.Ct. at 1844):

We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience . . . that the persons with whom he is dealing may be armed and presently dangerous . . . and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own . . . safety, he is entitled for the protection of himself . . . *to conduct a carefully limited search of the outer clothing of such persons* in an attempt to discover weapons which might be used to assault him. (Emphasis added.)

6. In Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), the Court said:

The purpose of this limited search is *not to discover evidence of crime,* but to allow the officer to pursue his investigation without fear of violence . . . . (Emphasis added.)

The Police Department's "Guidelines for the Exercise of the Authority to Stop and Frisk" (Departmental Memorandum of August 27, 1969), as set out in the joint appendix submitted in Long v. District of Columbia, D.C.Cir., 469 F.2d 927 (1972), provide (at 15):

The authority to frisk after a stop must be based on the conclusion that the person may be armed and dangerous. A frisk search (*i. e.,* an external feeling of clothing) is then permitted for purposes of self-protection to discover weapons.

The Guidelines also set forth some factors (at 18–19) which the officer should

## APPENDIX

In Williams v. United States, D.C.App., 287 A.2d 814 (1972), the police officer on patrol *knew* that a robbery had been committed "a few minutes" before and that the robber had run into a nearby alley; the officer *saw* a man standing in that alley who turned his back and commenced "fumbling with something" he was holding when the officer approached; and, finally, that man, *in response to* the officer's inquiry of what he was doing there, replied that he was coming from the store, but the officer knew the only store open at that time of night in that area was blocks away.

We upheld the stop for questioning.

In Campbell v. United States, D.C.App., 273 A.2d 252 (1971), the police officer *saw* two men walking together, one holding a TV and the other a screwdriver; and, *as he approached the men* the one dropped his screwdriver and, when the officer picked it up and proffered it to him, *he denied that it was his.*

We approved the stop and subsequent questioning by the officer as to the ownership of the TV, but held a subsequent "full-blown arrest necessitating a trip to the station house" invalid for lack of probable cause.

In United States v. Lee, D.C.App., 271 A.2d 566 (1970), the officer *knew* that two men's actions in and around another's truck parked at the curb had attracted the attention of other citizens and had drawn audible comment "that they [the two men] had better leave"; and, when the officer confronted one of the men and asked him for some identification *he brushed back his coat* revealing a bulge at the waist which turned out to be a pistol.

We upheld the officer's action of requesting identification and seizing the pistol.

In Jenkins v. United States, D.C.App., 284 A.2d 460 (1971), the officer *knew* that thefts from parked autos had been occurring in the area he was patrolling and that the man under his observation was wearing "jail" clothes; he *observed* that man "peer" into parked cars, then borrow a pair of pliers from the attendant at a nearby parking lot and, after being out of sight briefly, reappear with a bulge under his coat; and, when the officer working in plain clothes, identified himself to that man *he refused to remove his hand from under his coat.*

We approved the officer's actions in stopping the person and ascertaining what he was concealing under his coat.

In Smith v. United States, D.C.App., 295 A.2d 64 (1972), the officer *observed* two men looking into numerous parked cars for over an hour. Then, when the officer approached the two men, who had been out of his sight for a few minutes and one of whom now carried a brown paper bag, *one of the men ran away.*

We upheld the stop for questioning.

In Gaskins v. United States, D.C.App., 262 A.2d 810 (1970), the officer *learned* from a passing citizen that one of the three men walking nearby had just put a gun in his belt.

We upheld the stop of the three men and the seizure of the gun.

In United States v. Dowling, D.C.App., 271 A.2d 406 (1970), the officer *was told*

---

consider in determining whether to frisk while questioning a person suspected of committing a crime:

(a) nature of the suspected crime
(b) number of suspects in relation to number of officers present
(c) recent incidents of violence in the particular area
(d) the time of day
(e) prior knowledge of reputation and record of person being questioned
(f) age, sex, physical condition and demeanor of person being questioned
(g) bulge in or unusual appearance of clothing of person being questioned indicative of a concealed weapon.
*See also* The Law of Arrest, Search and Seizure, 1971 (prepared by the Training Division, Metropolitan Police Department) at 30–35.

that a man wearing a long black coat had a gun and had gone down a nearby alley and when the officer entered that alley he *saw* a man in a long black coat there who, upon seeing the officer, accelerated his pace; and, when the officer confronted that man *he refused to remove his hand from his coat.*

We upheld the stop and the seizure of the gun.

In Davis v. United States, D.C.App., 284 A.2d 459 (1971), the officer *received* a report on his radio that a specifically-named person was sitting at a certain place in a car of a fixed description with a gun; and, the officer *observed* a man in that kind of car at that place.

We upheld the action by the police in ordering the man from the car for questioning and their subsequent seizure of a pistol from the floor of the car.

In United States v. Frye, D.C.App., 271 A.2d 788 (1970), a passerby *told* the officer that a Cadillac automobile with a certain tag number was being loaded with weapons by six men at a certain address; and, the officer *saw* such a car with such a tag at that place with two men in it and two men walking away from it.

We upheld the officer's stop and questioning of the men and search of the auto for weapons.

In contradistinction to our decisions in the above cases,[1] we disapproved the police action in Robinson v. United States, D.C. App., 278 A.2d 458 (1971), and Gray v.

United States, D.C.App., 292 A.2d 153 (1972), where we deemed the knowledge of the officer, the activity he had observed and the immediate reaction of the citizen in his confrontation with the officer were insufficient to support the officer's belief that criminal activity might be afoot and, therefore, insufficient to justify his intrusion, that is, the stop for questioning and the frisk for weapons.

In *Robinson*, the officer (in uniform) saw two men, whom he had never seen before, late at night in a residential area of the city. First, they were observed walking on the sidewalk, and then, later standing in the garage of an apartment located in very close proximity to the street along which they had been walking. When the officer approached and asked them to wait they ignored him.

We held that his subsequent stop of the men for questioning was unreasonable and the fruits of his search must be suppressed.

In *Gray*, the officer, dressed in plain clothes, knew that there was considerable narcotics activity in the area of the city which he was patrolling; he saw one man pass money to another, while two others standing nearby looked about them; and, when he approached the four men, two left the scene. The officer identified himself and when one of the men under observation "took a few steps back", he reached under that man's coat and seized a pistol.

We held that the officer had insufficient basis to stop the men and search them for weapons without first asking questions.

---

1. In United States v. Burrell, D.C.App., 286 A.2d 845 (1972), which the Government has frequently cited in its briefs in "stop and frisk" cases before this court, we held (at 846) that the officer's "initial confrontation with appellee did not amount . . . to a 'seizure', within the purview of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." Thus, the "stop and frisk" issue was not in that case.