**UNITED STATES, Petitioner,**

v.

**Harvey L. JOHNSON, Respondent.**

**No. 81–1095.**

District of Columbia Court of Appeals.
Argued Sept. 14, 1984.
Decided Aug. 5, 1985.

7. Mr. Al-Hariri signed as President of the Georgetown Design Group when he wrote to

Mayor Barry on March 21, 1979.

Thomas J. Tourish, Jr., Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on brief, for petitioner.

Michael A. Stern, Washington, D.C., appointed by the court, for respondent.

Before MACK, FERREN and BELSON, Associate Judges.

FERREN, Associate Judge:

On November 23, 1983, a division of this court, with one judge dissenting, reversed respondent's conviction for carrying a pistol without a license, D.C.Code § 22–3204 (1981). *Johnson v. United States*, 468 A.2d 1325 (D.C.1983). The issue at the first hearing, and upon rehearing, is whether a gun and ammunition recovered from respondent's possession should have been suppressed as evidence obtained from an

unlawful *Terry* [1] seizure. We are now persuaded that the evidence was lawfully seized; accordingly, we vacate our earlier opinion and judgment and affirm respondent's conviction.

## I.

At approximately 10:30 p.m., police officer Lonnie Turner and two other officers, patrolling on motor scooters, passed a 1967 Cadillac parked with three men inside. According to Turner, the officers' suspicions were aroused by the lateness of the hour, the fact that the neighborhood was known for frequent robberies, their experience that robberies in the area often were committed by men working in groups of two or three, the bad paint and body damage of the car (representing a type of vehicle frequently used in robberies), and the fact that they had never seen the car before, although they were familiar with the neighborhood.

The officers decided to make a "spot check" of the car. As they approached, the driver got out and walked slowly toward the rear of the car. Officer Turner called out to the driver, "come here, police officer." The driver instead ran to the doorway of a nearby house. Two officers pursued him, while the third remained with the car until his partners returned with the driver.

Officer Turner testified that the driver's flight further aroused his suspicions about respondent and the other passenger in the car. The officers ordered the two men out of the car. While exiting, respondent reached for a green bag beside him on the front seat. Turner took the bag from him, placed it on the hood of the car, and began patting it down for weapons. As he did so, respondent told him to "dump it on the hood." Turner handed the bag to respondent, who emptied its contents onto the hood. Turner saw several rounds of .38 caliber ammunition fall out and proceeded to pat down respondent's clothing. He recovered a .38 derringer pistol, containing two live rounds of ammunition, from inside respondent's belt, as well as four more bullets in respondent's right front pocket. The police then placed respondent under arrest.

Respondent moved to suppress the pistol and ammunition. The trial court denied this motion, concluding that the officers' seizure of respondent had been a reasonable response to "the circumstances as they existed at that time," including the driver's flight.

On appeal to this court, respondent argued that the officers lacked reasonable and articulable suspicion warranting his seizure. The government contended that the driver's flight, when coupled with the officers' previous observations, reasonably heightened the officers' suspicions that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968); thus, the police had a reasonable basis for detaining the men and conducting a limited search to determine whether they were armed.

We concluded that:

> a situation in which persons unfamiliar to the police are parked in a car late at night in a high crime area does not, without more, present specific, articulable facts warranting suspicion of criminal activity.... Thus, unless the flight evidence is usable here against appellant, the government's case supporting a *Terry* seizure will fall short.

*Johnson*, 468 A.2d at 1327–28 (footnote and citations omitted). We further concluded that the driver's flight was provoked by an unlawful *Terry* seizure—the officers' command (without reasonable suspicion) to "come here"—and thus was the " ' "fruit" of official illegality.' " *Id.*, 468 A.2d at 1328 (quoting *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)). Accordingly, we held that the driver's flight could not "be used to ... create the critical mass of circumstances necessary to justify the subsequent

---

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

apprehensions of the driver and the passengers (including appellant)," *id.*, and that "[t]he trial court, therefore, should have granted appellant's motion to suppress evidentiary use of the pistol and ammunition." *Id.* at 1329.

## II.

The government petitioned for rehearing, urging this court to consider "the well established principle that a defendant may not challenge a violation of someone else's Fourth Amendment rights." *See Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Accordingly, says the government, even if the driver could challenge use of the flight evidence in attacking the propriety of his own *Terry* seizure, his companions, including respondent, had no legitimate expectation of privacy in the driver's person that would permit them to invoke his right to suppress the flight evidence. It follows, according to the government, that the propriety of respondent's *Terry* seizure must be evaluated by reference to all the circumstances—including the driver's flight—since respondent was obviously associated with the driver in a venture of some sort.

### A.

■ In *Rakas*, the Supreme Court held that " 'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.' " *Id.* at 133–34, 99 S.Ct. at 425 (quoting *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966–67, 22 L.Ed.2d 176 (1969)) (other citations omitted). Thus, before seeking to exclude evidence as a " 'fruit' of official illegality," a movant must show that his own fourth amendment rights have been violated. *United States v. Payner*, 447 U.S. 727, 731, 100 S.Ct. 2439, 2444, 65 L.Ed.2d 468 (1980); *Rakas*, 439 U.S. at 140, 99 S.Ct. at 428; *see Moore v. United States*, 468 A.2d 1342, 1344–45 (D.C.1983). As the Court made clear in *Rakas*, the question whether one's own rights have been violated is a matter of substantive fourth amendment law. 439

U.S. at 139, 99 S.Ct. at 428. That question properly turns on whether the challenged conduct invaded a legitimate expectation of privacy held by the party seeking exclusion. *Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980); *Payner*, 447 U.S. at 731, 100 S.Ct. at 2444; *Moore*, 468 A.2d at 1345; *United States v. Davis*, 199 U.S.App.D.C. 95, 107–08, 617 F.2d 677, 689–90 (1979).

### B.

We reaffirm our conclusion that the police officers had no legitimate basis for detaining and searching respondent before the driver's flight. *Johnson*, 468 A.2d at 1327–28. Thus, we must determine whether respondent had any legitimate expectation of privacy in the driver's person, *see United States v. Brown*, 743 F.2d 1505, 1507 (11th Cir.1984), in order to decide whether we were correct, initially, in concluding that the court could not properly consider the driver's unlawfully provoked flight as an additional factor relevant to determining whether respondent's conduct was sufficiently suspicious to warrant a *Terry* investigation.

■ We conclude that respondent had no such legitimate expectation. "Unlike a house, a hotel room, an automobile or a briefcase, one cannot acquire a right to exclude others from access to a third person." *Brown*, 743 F.2d at 1507. Clearly then, even if the police unlawfully provoked the driver's flight with the command to "come here," the police "infringed [no] interest of [respondent's] which the Fourth Amendment was designed to protect." *Rakas*, 439 U.S. at 140, 99 S.Ct. at 429. Accordingly, the officers were free to consider the driver's flight in determining whether they had a reasonable, articulable suspicion, based on all the circumstances, that would justify detaining the driver's companions, including respondent. *Cf. Davis*, 199 U.S.App.D.C. at 107–08, 617 F.2d at 689–90 (evidence and statements obtained illegally from first defendant may be used

to find probable cause to arrest second defendant).[2]

Put another way, *Rakas* requires the court to resolve whether an accused can invoke another person's legitimate expectation of privacy *before* the court considers whether that other person's rights have been violated. If the accused cannot properly do so, that ends the inquiry. In this case, therefore, because there is no basis for respondent to invoke the fleeing driver's right not to be stopped, the driver's flight must be considered without any question of taint. In sum, because of *Rakas*, the premise of our original opinion—unlawfully provoked flight—is not reachable and thus is not properly in this case; there is no cognizable illegality to challenge.

Our dissenting colleague, reflecting the concern inherent in our first opinion, makes a telling point: the result here is irrational. "[E]ven though the driver's flight may not be used to seize the *driver* (since he may 'suppress' his own flight), that flight may still be used" by the police in evaluating whether there are grounds to "seize a companion whose behavior is otherwise" insufficiently suspicious to warrant a *Terry* detention. *Post* at 599 n. 4. We agree that the result is irrational, and thus arguably unjust, but we understand *Rakas* to compel that result.[3]

## C.

We therefore must determine, finally, whether the driver's flight, when added to the other factors arousing suspicion, justified the seizure of respondent under *Terry*. This inquiry presents three separate questions: (1) whether flight from authority is germane to determining whether a police officer's suspicion is reasonable under *Terry*; (2) if so, whether the driver's flight, under the circumstances here, was reasonably imputable to respondent; and (3) if so, whether the trial court correctly ruled that the officers' seizure of respondent was a reasonable response to "the circumstances as they existed at the time." We answer all questions in the affirmative.

**2.** Respondent alternatively argues that he had "automatic standing" under *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In *Jones,* the Supreme Court held that any person charged with a possessory offense could challenge the search which produced evidence against him. *Jones* was overruled by *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), but respondent notes that he was charged and convicted in 1975, five years before *Salvucci.* Respondent accordingly contends that *Jones* governed lower courts at the time of his trial and thus conferred standing upon him to challenge the legality of the seizure of the driver.

In fact, however, respondent, during argument on the motion to suppress, did not premise his *Terry* argument on the inappropriate consideration of the driver's flight. Both parties and the trial court appear to have assumed that the police were entitled to consider the driver's flight in determining whether to stop and frisk the three men. The trial court expressly premised its conclusion that the officers had acted reasonably in part on the driver's flight. Thus, under the defense theory of the case, the sum of the officers' observations, including the driver's *flight, did* not constitute a sufficient basis for a *Terry* seizure. The issue of the legality of the initial seizure of the driver was not raised until

we chose to recognize it *sua sponte,* on direct appeal, in 1983. *Salvucci,* which abolished the "automatic standing" rule, was decided in 1980 and thus was controlling law when the question of "standing" was first raised. *Cf. United States v. Ross,* 210 U.S.App.D.C. 342, 347–48, 655 F.2d 1159, 1164–65 (1981), *rev'd on other grounds,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (applicable law of standing to raise fourth amendment claims is law in force at time that defendant raises claim).

**3.** *Rakas,* therefore, creates the possibility for a police officer deliberately to violate one person's rights during a street encounter, such as the one at issue here, in the hope of provoking a response that will tend to incriminate that person's companions and thus justify a *Terry* seizure that otherwise would be unlawful. *Cf. United States v. Payner,* 447 U.S. 727, 730, 743, 100 S.Ct. 2439, 2443, 2450, 65 L.Ed.2d 468 (1980) (respondent lacked standing to suppress evidence recovered during illegal search of third person despite court's finding that government had deliberately counseled its agents that "Fourth Amendment standing limitation permits them to purposefully conduct an unconstitutional search and seizure of one individual in order to obtain evidence against third parties"). We perceive no deliberate violation here, but the possibility, since *Rakas,* is there.

■ First, we have previously determined, as a general proposition, that flight from authority—implying consciousness of guilt—may be considered among other factors justifying a *Terry* seizure. *See Stephenson v. United States,* 296 A.2d 606, 609–10 (D.C.1972) (collecting cases), *cert. denied,* 411 U.S. 907, 93 S.Ct. 1535, 36 L.Ed.2d 197 (1973). In *Stephenson,* we noted that this court has

> unfailingly considered certain factors in determining whether an on-the-street stop for questioning by a police officer was reasonable. These are: (1) the particular activity of the person stopped ... which the investigating officer has observed, (2) that officer's knowledge about (a) the activity and the person observed and/or (b) the area in which the activity is taking place, and (3) *the immediate reaction or response of the person approached and questioned by the officer.*

*Id.* at 609 (footnote omitted) (emphasis added).

■ Second, the question of imputation must be answered by reference to all the facts; one person's flight is imputable to another only if other circumstances indicate that the flight from authority implies another person's consciousness of guilt as well.[4] Here, we have the following facts: the officers observed respondent and his companions parked in an unfamiliar, damaged car at a late hour in a high crime area where—in the officers' experience—robberies often were committed by men in groups of two or three driving such a vehicle. The driver literally fled after the officers issued a command to "come here"; he did not merely respond calmly or walk away.

■ Under the circumstances, the officers reasonably could conclude that all three men were associated in a venture of some sort, whether innocent or criminal, and that the driver's flight when they confronted him, implying consciousness of guilt, reflected the mind set and activity of those with whom he was associated under somewhat suspicious conditions. *See Franklin v. United States,* 382 A.2d 20, 22 (D.C.) (*Terry* stop of three appellants justified where one fled on foot from officers monitoring lookout for robbery suspects, then entered car in which other appellants were sitting, and car sped off), *aff'd in relevant part,* 392 A.2d 516 (D.C.1978), *cert. denied,* 440 U.S. 948, 99 S.Ct. 1428, 59 L.Ed.2d 637 (1979); *Smith v. United States,* 295 A.2d 64, 65–66 (D.C.1972) (flight of companion imputed to appellant where officers earlier had observed suspects looking into parked cars and later saw them leave zoo, with appellant carrying paper bag he did not have before), *cert. denied,* 411 U.S. 951, 93 S.Ct. 1932, 36 L.Ed.2d 414 (1973) (footnote omitted).[5]

---

4. If, for example, a police officer approaches two persons chatting at a bus stop and speaks to one of them who immediately runs away, there would be no basis, without more, for the officer to detain the person who remained. *See In re Appeal No. 113,* 23 Md.App. 255, 326 A.2d 754 (1974) (no basis for *Terry* stop of appellant when one of his two companions, carrying paper bag, fled as police approached trio walking down street one morning).

5. *Lyons v. United States,* 221 A.2d 711 (D.C.1966) —a pre-*Terry,* probable cause case on which our dissenting colleague primarily relies—is inapposite. There, a police officer saw one occupant of an automobile, Spriggs, who was "known to the officer as a thief and a convicted narcotics user," *id.* at 711, leave the car, look around in a suspicious manner, enter a building for ten minutes while the car circled the block, return to the car after looking "up and down the street," *id.,* and then, as the officer approached the car, place in his shoe a dark envelope which the officer "suspected of being narcotics." *Id.* at 712. The officer arrested Spriggs and also arrested the other two occupants of the car, the driver and appellant, Lyons, who was later prosecuted as a narcotic vagrant once an examination of his arm disclosed needle marks.

The question was whether, assuming probable cause to arrest Spriggs, the officer also had probable cause to arrest Lyons. This court held he did not, since "[t]here was no evidence that Lyons had any knowledge of the possession of the narcotics by Spriggs," *id.,* and "Lyons' only connection with Spriggs was that they were both occupants of the same car." *Id.* We noted that the circumstances "may have given rise to a suspicion that Lyons was engaged with Spriggs in some illegal narcotic activity, but mere suspicion will not justify an arrest." *Id.* This language, focusing on probable cause, indicates

■ Finally, we agree with the trial court that the "totality of the circumstances, including the flight of [respondent's] companion," provided a reasonable basis for an investigatory detention and related search of respondent. Although we reaffirm that "a situation in which persons unfamiliar to the police are parked in a car late at night in a high crime area does not, without more, present specific, articulable facts warranting suspicion of criminal activity, and thus does not justify a *Terry* seizure," 468 A.2d at 1327, we conclude that the driver's flight, when added to the other circumstances, created a critical mass of suspicious activity—a "minimal level of objective justification" [6] sufficient to warrant further investigation, including a brief detention of the men still in the car.[7]

*Affirmed.*

BELSON, Associate Judge, joining in part and concurring in the result.

I am unable to join unreservedly in the opinion of the court. I remain of the view, expressed in my dissent from this division's earlier opinion on this appeal, that we should not reach the issue of the legality of the stop of the driver because appellant failed to raise that issue either before the trial court or on appeal. *Johnson v. United States,* 468 A.2d 1325, 1329 (1983). It

that if *Terry* (which was decided two years later) had been the law at the time, this court might have concluded that the police had a reasonable suspicion of criminal activity, based primarily on Spriggs' activity, that would justify a brief detention of Lyons and the driver to investigate further.

**6.** *Immigration and Naturalization Service v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984); *see United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion) ("particularized and objective justification").

**7.** Our dissenting colleague characterizes respondent's behavior as "entirely innocent," *post* at 600, and thus perceives that we justify respondent's *Terry* seizure on the ground that a passenger in a car may be seized if the *only* basis for police suspicion is the driver's flight on foot when the police attempt to stop him. *See post* at 600–601 & n. 8 (citing cases where flight

follows that we need not resolve the issue of standing.

I also have reservations about the opinion's discussion of the issue of standing, Part II B. I think it not irrational to limit the reach of the exclusionary rule in Fourth Amendment cases to instances in which the authorities breached the rights of the accused, as distinguished from rights of some other person.

With those reservations, I express my agreement with the opinion's application of the standing requirement and its determination of the effect of that application on the disposition of this appeal. Therefore I join in Parts II A, II C, and the portion of II B that holds that the police did not invade a legitimate expectation of privacy held by appellant.

## I.

MACK, Associate Judge, dissenting:

The majority's admittedly irrational conclusion in this case is reached not because of the Supreme Court's holding in *Rakas v. Illinois,*[1] but because of an erroneous premise embraced by this court in *Johnson I*[2]—that the outcome of Johnson's motion to suppress a gun and ammunition found on his person should turn upon the legality

was the only factor). That analysis of our position is incorrect. *See supra* note 4 and accompanying text. All the circumstances, not just the driver's flight, are relevant. That the other circumstances, without the flight, are not enough to warrant an articulable suspicion of criminal activity does not mean that the various factors noticed by the police, taken together, are wholly unsuspicious and irrelevant; they cannot be called "entirely innocent." Without the flight, these other factors are consistent with an innocent or a criminal explanation and thus do not provide "some minimal level of objective justification" for a seizure. *INS,* 104 S.Ct. at 1763. But with the flight, the inference of criminal activity, based on all the circumstances, becomes reasonable.

**1.** 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

**2.** *Johnson v. United States,* 468 A.2d 1325 (D.C. 1983).

or illegality of the seizure of the driver of the car in which Johnson had been seated prior to his apprehension. In fact, *Rakas* has no application to this case. In reshaping *Rakas* to fit the circumstances here, the majority has introduced into an already sufficiently tortuous law of Fourth Amendment standing a new and bizarre element: that a defendant can be required to prove an "expectation of privacy" (*Rakas*) in *facts* alleged to comprise the articulable basis for his apprehension by the police (*Terry*).

We are met here with a comedy of errors. In *Johnson I*, the majority found that the police had illegally seized Johnson's companion, the driver of the car in which Johnson was seated when the police arrived. Since the driver had been illegally seized, his reaction to the police's actions— his "flight"—was termed a "fruit" of that seizure. Describing the "flight" as a "fruit," however, leads to the inexorable conclusion that as a "fruit" it can be "suppressed" (even though it is not tangible evidence that the government seeks to admit to prove a substantive offense, but is a mere element upon which reasonable suspicion is based). This was faulty reasoning.[3] Now, on petition for rehearing, the *Rakas* analysis is applied (adding insult to injury): although "flight" as a "fruit" can be suppressed, only the person who *flies* has an "expectation of privacy" in his own flight, and therefore only the driver can "move to suppress" this particular "fruit." The "flight as a fruit" analysis of *Johnson I* has thus paved the way (with the help of the government) for the majority's conclu-

sion here, that since Johnson has no "expectation of privacy" in the driver's person, he cannot "suppress" his flight; and that the flight may therefore form the basis for a finding that the police had reasonable suspicion that Johnson was involved in illegal activity.

*Rakas*, however, held only that in order to suppress *tangible* evidence at trial, a defendant must have an expectation of privacy in the *place* from which that evidence is recovered. Johnson clearly had such an expectation in this case, since the tangible evidence was seized from his person and his bag. The majority's reasoning has the effect of extending *Rakas* to require an expectation of privacy not only in the place from which evidence is recovered, but also in certain elements of "articulable suspicion"—*i.e.,* events, or facts—relied upon by the police in their decision to make an investigative stop of the defendant.[4]

The majority has reached this strange result because it is building on a strange premise: that the seizure of the driver is at issue in Johnson's challenge to the admission of evidence. A long line of Supreme Court precedents establishes, however, that the only seizure that a criminal defendant may challenge is his own. *See, e.g., Alderman v. United States*, 394 U.S. 165, 171, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969); *Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 973, 19 L.Ed.2d 1247 (1968); *Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960).[5] Not surprisingly, the trial court made no findings regarding the interaction between the police and the driver, and

3. Admittedly, the dissenting author in the instant case supplied the deciding vote for the majority holding in *Johnson I.*

4. Even operating within the majority's paradigm, the majority's irrational result well illustrates the infirmity of its entire reasoning process: that even though the driver's flight may not be used to seize the *driver* (since he may "suppress" his own flight), that flight may still be used to seize a companion whose behavior is otherwise innocent. A common sense approach to the problem under even the majority's first principles should reach exactly the opposite re-

sult: we should give *less* weight to the driver's flight in assessing cause to seize a passenger whose behavior was entirely innocent, than in assessing cause to seize the driver who took flight at the approach of the police.

5. *Rakas*, however, does not stand for this principle, since the defendants there disavowed any intention to challenge the government's seizure of their persons. *See* 439 U.S. at 150–51, 99 S.Ct. at 434 (Powell, J., concurring); *id.* at 160 n. 5, 99 S.Ct. at 439 n. 5 (White, J., dissenting).

Johnson did not even attempt to assert that the driver's seizure was illegal at any stage of the proceedings, either in the trial court or on appeal. There is no question that had an action been brought against the driver, he could have challenged his own seizure, and if that seizure was found to be without support ab initio, of course his flight at police instigation could not be used to justify it after the fact. In this proceeding, however, the question of the seizure of the driver is irrelevant.

## II.

The sole question for us to determine on this appeal is therefore whether the specific facts known to the police were sufficient to ground a stop of Johnson. The court held in *Johnson I,* and the majority today affirms the conclusion, that the police officers had no legitimate basis for detaining and searching Johnson before the driver's flight. The implication flowing from the result now reached by the majority, that one man's flight is "imputable" to another man whose behavior is entirely innocent, is untenable. It confers legitimacy upon an inference of guilt created entirely by association, a repugnant principle that until today has been rejected by this court. For example, in *Lyons v. United States,* 221 A.2d 711 (D.C.1966), we were faced with a similar scenario: the police were on the lookout for housebreakings, and they observed a stopped car containing three male passengers. One of the passengers, Spriggs, was known to the police as a thief

and a narcotics user. The others, the appellant Lyons and the driver, were not known to the officers. The police observed Spriggs getting out of the car and looking about in a "suspicious" manner. He entered a building as the driver circled the block, and then returned to the car. As the officers pulled up alongside the car, they observed Spriggs placing an envelope into his shoe. They arrested Spriggs and discovered narcotics on his person. They also seized the other passengers and charged Lyons after observing needle marks on his arm. We held that the seizure of Lyons was illegal since "Lyons' only connection with Spriggs was that they were both occupants of the same car" and that "mere suspicion" was an insufficient basis to impute Spriggs' conduct to Lyons. *Id.* at 712.[6] Although in *Lyons* the companion's conduct was independently suspicious, not provoked by the arrival of the police as in this case, the court held that the conduct could not be imputed to Lyons even though Spriggs and Lyons were occupants of the same car. Here, the driver was unknown to the police and engaged in no suspicious activity other than his flight up to a nearby house at police instigation. A fortiori there is no basis here to impute such ambiguous conduct to Johnson. Indeed, we have never held that an individual may be seized based solely on the flight of a companion at the approach of the police, and the cases cited by the majority for this proposition are inapposite since in each of those cases the appellant *himself* was engaged in suspicious activity.[7] *See also Sibron v. New*

6. Although *Lyons* was a probable cause case, applying a *Terry* analysis to its facts would not lead to a different result on the question of whether the police could legitimately impute Spriggs' conduct to Lyons and then stop Lyons on that basis alone.

7. In *Smith v. United States,* 295 A.2d 64 (D.C. 1972), *cert. denied,* 411 U.S. 951, 93 S.Ct. 1932, 36 L.Ed.2d 414 (1973), the arresting officer had observed the defendant and a companion looking in car windows for an hour in an area known for car thefts. He then watched as they entered the zoo, and saw them emerge holding a *bag they were not* carrying when they walked in. When the officer attempted to stop them for

questioning, the companion ran, and we held that based upon this entire sequence of events, the officer was justified in seizing the defendant. In *Franklin v. United States,* 382 A.2d 20 (D.C.1978) (on rehearing, 392 A.2d 516 (D.C. 1978), *cert. denied,* 440 U.S. 948, 99 S.Ct. 1428, 59 L.Ed.2d 637 (1979)), appellants were suspects in an armed robbery that had just occurred. All of the appellants fled by car when the police attempted to question them. And in *Stephenson v. United States,* 296 A.2d 606 (D.C.1972), *cert. denied,* 411 U.S. 907, 93 S.Ct. 1535, 36 L.Ed.2d 197 (1973), the defendants did not run at the arrival of the police, but were merely observed by the authorities running down a street at 4:30

*York,* 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968) (fact that defendant was observed talking to a number of known narcotics addicts over a period of a few hours is insufficient to justify seizure); *Hinton v. United States,* 137 U.S.App.D.C. 388, 391, 424 F.2d 876, 879 (1969) ("[c]ourts have never countenanced arrest by association"); *State v. Larson,* 93 Wash.2d 638, 642, 611 P.2d 771, 774 (1980) (illegal act by driver insufficient to justify stop of passenger).

The conclusion is inescapable that the seizure of Johnson was not grounded on articulable facts. The driver's act in running up to a nearby building as the police approached, without any other circumstances to give the police cause to believe that a crime had been or was about to be committed, is simply insufficient to justify the seizure of Johnson. · Even if the driver's

conduct could be imputed to Johnson, flight at the arrival of the police alone does not provide the police with a reasonable basis for a *Terry* stop.

Viewed from a purely objective level of · observation, the act of running a short distance to a nearby building ... is an action so universal in character that one can only speculate as to its motivating source. Even when the act of running is motivated by an effort to avoid contact with the police, it still does not constitute the type of specific and articulable fact that is constitutionally sufficient to justify a stop.

*People v. Thomas,* 660 P.2d 1272, 1275 (Col.1983) (en banc). Every court to consider the issue has held that actions that may be interpreted as avoidance of the police, without more, cannot serve to justify an investigatory stop.[8] Although there is no

---

in the morning, a sufficiently unusual hour to justify a stop for questioning.

**8.** *See People v. Aldridge,* 35 Cal.3d 473, 479, 198 Cal.Rptr. 538, 541, 674 P.2d 240, 243 (1984) ("The departure of defendant and others from an imminent intrusion [by the police] cannot bootstrap an illegal detention into one that is legal."); *McClain v. State,* 408 So.2d 721, 722 (Fla.App.) (where defendant's "behavior ... taken for its most insidious implications, indicated only that he wanted to avoid police," such conduct is insufficient to justify a stop), *app. dism'd mem.,* 415 So.2d 1361 (Fla.1982); *Kearse v. State,* 384 So.2d 272, 274 (Fla.App.1980) (act of walking away briskly after observing police approaching is insufficient to justify investigatory stop); *State v. Kupihea,* 59 Haw. 386, 387, 581 P.2d 765, 766 (1978) (avoidance of police alone insufficient to justify stop); *People v. Fox,* 97 Ill.App.3d 58, 64, 52 Ill.Dec. 219, 223, 421 N.E.2d 1082, 1086 (1981) (accelerating away at approach of marked police vehicle insufficient); *State v. Hathaway,* 411 So.2d 1074, 1079 (La. 1982) ("Flight does not always indicate guilt; it may result from fear and possibly other causes. Even where flight does reasonably appear designed to avoid apprehension, reasonable cause will not arise unless flight, combined with other information upon which officers are entitled to rely, would indicate to a reasonable mind that the combination of circumstances is inconsistent with any innocent pursuit."); *People v. Tebedo,* 81 Mich.App. 535, 539, 265 N.W.2d 406, 408 (1978) (fact that defendant ran as police approached does not justify investigative stop,

"particularly when, as here, defendant's running is not flight from the scene of a reported crime. The police must positively relate the flight to commission of a crime."); *Commonwealth v. Barnett,* 484 Pa. 211, 212–15, 398 A.2d 1019, 1020–21 (1979) (flight alone is insufficient even for a limited investigatory stop); *Commonwealth v. Jeffries,* 454 Pa. 320, 324, 311 A.2d 914, 917 (1973) (fact that defendant quickened his pace when he saw police officer and started to run when officer began to chase him "is not enough to justify a seizure under *Terry* ... absent some other factor which would give rise to suspicion of criminal conduct"); *Commonwealth v. Stratton,* 231 Pa.Super. 91, 95, 331 A.2d 741, 742 (1974) ("[t]here is no question that flight alone, even upon seeing a police officer, would not be sufficient to justify stopping and searching the defendant"). *See also Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963) (to allow flight to serve as basis for probable cause for a seizure "would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked"); *Hickory v. United States,* 160 U.S. 408, 417, 16 S.Ct. 327, 830, 40 L.Ed. 474 (1896) (in determination of guilt, flight is a "mere circumstance[ ] to be considered and weighed in connection with other proof with that caution and circumspection which their inconclusiveness when standing alone require"; *cf. Wong Sun,* 371 U.S. at 483 n. 10, 83 S.Ct. at 415 n. 10 (*Hickory*-type analysis applies equally to probable cause determinations)).

case directly on point from this jurisdiction, in *Coleman v. United States*, 337 A.2d 767, 770–71 (D.C.1975), we held that the police were not justified in frisking the appellant based on the fact that he was observed knocking on the door ton a home in an area known for burglaries at 10:00 p.m., notwithstanding the fact that he hurriedly walked away from the door as the police approached. And the highest court of Maryland has stated that weight may be given to a suspect's flight from police only if this conduct is "corroborated by other suspicious circumstances"; flight alone is insufficiently indicative of criminal activity to justify an investigatory stop solely on that basis. *Watkins v. State*, 288 Md. 597, 603–04, 420 A.2d 270, 273–74 (1980). In keeping with this principle, this court has upheld findings of reasonable suspicion that are based upon flight *only* when there are other articulable facts that allow a reasonable inference that a crime has been or is about to be committed.[9] For flight is not "a reliable indicator of guilt without other circumstances to make its import less ambiguous." *Hinton v. United States, supra*, 137 U.S.App.D.C. at 391, 424 F.2d at 879.

The majority argues, however, that there are "other circumstances" here indicating that the driver's "flight from authority implies [Johnson's] consciousness of guilt as well." *Ante*, at 597. These other circumstances—the same circumstances that were rejected as insubstantial in *Johnson I*[10]—are reduced to the fact that that appellant was sitting with two other men in a Cadillac with chipped paint and body damage—a car "unfamiliar" to the police—

parked in a "high crime" area at 10:30 p.m. We have repeatedly rejected all of these factors as legal bases for a *Terry* stop. For example, in *Jones v. United States*, 391 A.2d 1188 (D.C.1978), we held that the police had insufficient articulable facts to order appellant out of a car, where the facts

showed only that two men were seen sitting in an automobile late at night in an area where there had been illicit drug activity and robberies, and that when the officer moved close to their vehicle in his darkened patrol car, one of the men attempted to hide something under the seat. The officer had no complaint or report of crime, had never seen appellant or his companion before, and did not see them engage in criminal conduct. In short, the record contains little if any evidence from which one might conclude that the officer had reasonable grounds to believe that criminal activity was afoot. The fact that the officer encountered the two men during the early morning hours in an area where there had been robberies and drug trafficking certainly did not provide a basis for the "seizure." Nor did the fact that the passenger moved in a manner which led the officer to suspect that he might be hiding a weapon under the seat. In this case, the officer seized the two men on the basis of suspicion, rather than on the specific and articulable facts necessary to justify a "seizure." In so doing, he violated the Fourth Amendment's proscription against unreasonable searches and seizures.

---

**9.** *Tobias v. United States*, 375 A.2d 491, 494 (D.C.1977) (defendant also observed engaging in what appeared to be a number of drug transactions); *Edwards v. United States*, 379 A.2d 976, 978 (D.C.1977) (en banc) (suspects observed carrying what appeared to be fruits of a crime); *see Hinton v. United States, supra*, 137 U.S.App. D.C. at 391, 424 F.2d at 879 (defendant was in company of known drug dealer and was about to enter a narcotics "pad," which the police had a warrant to search). *See also* cases cited in note 7, *supra*.

**10.** "[W]e reaffirm [ ] that a situation in which persons unfamiliar to the police are parked in a car late at night in a high crime area does not, without more, present specific, articulable facts warranting suspicion of criminal activity, and thus does not justify a *Terry* seizure." *Johnson v. United States*, 468 A.2d 1325, 1327 (D.C.1983). "Lacking specific, articulable facts, including rational inferences, warranting suspicion of criminal activity before the driver's flight, the police had no legitimate basis for seizing the driver, let alone the passengers of the car." *Id.* at 1328–29.

*Id.* at 1191 (citations omitted).[11] Similarly here, none of the facts articulated by the police provide a basis for a seizure of Johnson. There is no need to apprise the majority of the fact that in a city the size of Washington, any particular vehicle more often than not will be unknown to the police. *See Brown v. Texas,* 443 U.S. 47, 49, 52, 99 S.Ct. 2637, 2639, 2641, 61 L.Ed.2d 357 (1979) (articulable suspicion cannot be founded on fact that suspect had never before been seen by police in area). The spectrum of legitimate human behavior occurs every day in so-called "high crime" areas, *see Brown,* 443 U.S. at 52, 99 S.Ct. at 2641 ("high crime" neighborhood factor cannot give rise to reasonable suspicion); *see also Curtis v. United States,* 349 A.2d 469, 472 (D.C.1975); *Jones v. United States, supra,* 391 A.2d at 1191. Moreover, the time—10:30 p.m.—is not a sufficiently late or unusual hour to give rise to suspicion of some likely criminality. *See Robinson v. United States, supra; Tyler v. United States, supra; Jones v. United States, supra.* If sitting in such a vehicle in the evening in a "high crime" neighborhood were legitimate grounds for the type of police action we are here reviewing, the police would be able to impose a de facto curfew on a large percentage of this city's residents. Furthermore, if a car's body damage and chipped paint were accorded significance in the assessment of "reasonable suspicion," the automobiles of quite a number of Washingtonians—including several members of this court—would put their owners at risk. Finally, the suggestion that likely criminality can be inferred from the presence of three men together hardly deserves comment. None of these factors individually has any legal significance, and their whole does not exceed the sum of the parts.

In sum, I believe that the police had no ground to stop Johnson on these facts, and that the result reached in *Johnson I*—the suppression of Johnson's gun and ammunition—was correct. In addition, I predict that the application of the *Rakas* analysis to the issue presented here will utterly—and needlessly—confuse the law of Fourth Amendment standing. For these reasons, I respectfully dissent.

---

11. In addition, in *Robinson v. United States,* 278 A.2d 458, 459 (D.C.1971), we held that the police were unjustified in searching appellant, who walked down the street at 2:00 a.m. and ignored a request by the police to "wait," because "the officers had no complaint or report of a crime, had never seen appellant before and did not observe him engage in unlawful conduct." We held that although "[i]t may be that presence on the streets of this city at an early hour in the morning is suspicious conduct, given present crime statistics, [ ] something more than that is required to justify police detention and interrogation." And in *Tyler v. United States,* 302 A.2d 748, 749, 752 (D.C.1973), we held that a warrantless search was unjustified when it was based solely on the fact that appellant was sitting in a car parked in an alley at 3:30 a.m., despite the fact that appellant or a companion engaged in what appeared to be furtive acts as the officers approached.