**John H. SMITH, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 84–1643.**

District of Columbia Court of Appeals.

Argued En Banc Nov. 12, 1987.
Decided April 28, 1989.

Robert J. Murphy, for appellant.

Michael W. Farrell, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. at the time the brief was filed, Judith Hetherton, Thomas E. Zeno, Washington, D.C., and Mark G. Gellar, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge,[1] and MACK, NEWMAN, FERREN, BELSON, TERRY, and STEADMAN, Associate Judges, REILLY and PRYOR,[2] Senior Judges.

NEWMAN, Associate Judge:

Following a suppression hearing and a bench trial, appellant was convicted of carrying a pistol without a license. On his appeal, a majority of a division of this court affirmed his conviction, rejecting appellant's argument that the pistol was seized in violation of his Fourth Amendment rights and that its admission into evidence was constitutional error. *Smith v. United States*, 525 A.2d 200 (D.C.App.), *vacated*, 531 A.2d 288 (D.C.App.1987). We granted appellant's petition for rehearing en banc and vacated the division's opinion and judgment. We hold the police did not have a sufficient basis to conduct a *Terry*[3] stop. We reverse the conviction.

**I.**

On March 22, 1984, while working near 12th and U Streets, N.W., an area known for its high incidence of narcotics trafficking, an undercover police officer purchased narcotics from two individuals; he immediately broadcast a description of them to waiting arrest teams. Two minutes later, four officers, who were dressed in casual clothing and travelling in an unmarked police cruiser, arrived at the scene. There Officer Lawson, an experienced officer in narcotics related activities, observed appellant Smith conversing in a parking lot with two persons fitting the descriptions in the broadcast. Although Officer Lawson observed other persons in the parking lot, Smith was the only person he observed in the immediate vicinity of the two suspects.

As the vehicle driven by Lawson arrived at a "fast clip," Smith began leaving at a "very fast" pace. While Officer Lawson followed Smith, the remaining officers followed the two other individuals. Believing that Smith might have participated in the narcotics transaction as the money man and might have possessed prerecorded funds, Officer Lawson testified that he identified himself as a police officer and asked Smith to stop. When Smith stopped, he responded that he had nothing to do with the two other men and then continued to walk away. It was at this point Lawson placed his hand on Smith's shoulder. Reacting, Smith spun away and attempted to hit Lawson in the face. A struggle ensued and the two men fell to the ground. Smith was subdued and a pistol was recovered from his pocket.

Appellant was charged with assaulting a police officer, and carrying a pistol without a license. He moved to suppress the weapon. The trial court refused to suppress the pistol, holding that the police had an adequate basis to conduct a *Terry* stop. Fol-

---

1. Judge Rogers was an Associate Judge of this court at the time of argument. Her status changed to Chief Judge on November 1, 1988.

2. Judge Pryor was Chief Judge of this court at the time of argument. He was commissioned as a Senior Judge on November 2, 1988.

3. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

lowing a bench trial, Smith was acquitted of the assault charge but convicted of carrying a pistol without a license.

## II.

In any challenge of a conviction based upon a claim of an improper *Terry* stop, we must initially determine whether a Fourth Amendment seizure has occurred. Here, such a seizure exists, since, as the trial court found, Lawson's show of authority by both announcing he was a police officer and ordering Smith to stop was an investigative seizure implicating Fourth Amendment protections. *See Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968); *see also United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *In re D.J.*, 532 A.2d 138, 140 (D.C.App.1987).[4] However, to justify such an intrusion upon the constitutionally protected interests of a private citizen, a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, *supra*, 392 U.S. at 21, 88 S.Ct. at 1880 (footnote omitted).

The United States points to several factors, which in its view, justified the stop: (1) appellant was engaged in a conversation with two men who less than two minutes before had been the subjects of a radio run for a narcotics transaction; (2) no other persons were in the immediate area; (3) the experienced police officer was aware that narcotics sales are often made by several persons working as a team; (4) the neighborhood was a high narcotics trafficking area; and (5) appellant attempted to leave hurriedly when the officers suddenly appeared on the scene. *Terry* compels us to evaluate the totality of the circumstances constituting articulable suspicion. *See id.* at 21, 88 S.Ct. at 1880; *United States v. Bennett*, 514 A.2d 414, 416 (D.C.App.1986). We thus examine all these factors individually and collectively, for to adequately evaluate the whole, it is helpful to evaluate the constituent parts.

The government attaches significant import to factor (1), i.e., Smith was engaged in conversation with suspected drug dealers. However, "[p]resumptions of guilt are not lightly to be indulged from mere meetings." *United States v. Di Re*, 332 U.S. 581, 593, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948). In the context of probable cause for arrest, the Supreme Court has eschewed the notion of guilt by association. In *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the companion case to *Terry*, the police approached and searched Sibron for the sole reason that he had been observed talking to several known narcotics addicts over a period of eight hours. The court ruled that the heroin found in the search of Sibron's person was inadmissible against him, stating:

> It must be emphasized that Patrolman Martin was completely ignorant regarding the context of these conversations, and that he saw nothing pass between Sibron and the addicts. So far as he knew, they might indeed 'have been talking about the World Series.' The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security.

*Id.* at 62, 88 S.Ct. at 1902.

This principle was reinforced in *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), a case involving the illegal search of a man present at a tavern in which the police were executing a search warrant of the premises, and of the bartender who was suspected of distributing heroin. Emphasizing that "Ybarra made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing suspicious to the police officers," *id.* at 91, 100 S.Ct. at 342, the Court, citing

---

**4.** The government relies on cases such as *United States v. Burrell*, 286 A.2d 845, 846 (D.C.App. 1972), to support its contention that there was no seizure. To the extent, if any, that *Burrell* may conflict with our holding here, we note that its continuing vitality has been called into question by *United States v. Mendenhall, supra.*

*Sibron,* reiterated that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.*[5]

Courts in other jurisdictions have been faithful to *Sibron* and *Ybarra* in rejecting articulable suspicion arguments based upon guilt by association. *See, e.g., People v. Ballejo,* 114 A.D.2d 902, 495 N.Y.S.2d 75, 77 (1985) (police suspected defendant because he accompanied a person hiding cocaine; court held that *Terry* frisk improper because "no ... inference of guilt by association is permissible"); *Commonwealth v. Luddy,* 281 Pa.Super. 541, 422 A.2d 601 (1980) (*Terry* frisk improper when person's mere presence at premises which were being searched pursuant to a warrant), *cert. denied,* 454 U.S. 825, 102 S.Ct. 114, 70 L.Ed.2d 99 (1981); *State v. Larson,* 93 Wash.2d 638, 642, 611 P.2d 771, 774 (1980) (parking violation by driver is insufficient grounds for *Terry* stop of passenger).[6]

The courts in the District of Columbia have also rejected articulable suspicion arguments based upon guilt by association. *See Hinton v. United States,* 137 U.S. App. D.C. 388, 391–92, 424 F.2d 876, 879–80 (1969) (recognizing that "[c]ourts have never countenanced arrest by association," the circuit court found probable cause because of Hinton's flight after his companion had been searched and found to possess contraband, the fact that he was on his way to a suspected narcotics "pad," and his association with a known narcotic user who had an outstanding court attachment against him); *U.S. v. Johnson,* 496 A.2d 592, 597 n. 4 (D.C.App.1985) (*Terry* case stating that "one person's flight is imputable to another *only if other circumstances* indicate that flight from authority implies another person's consciousness of guilt....") (empha-

sis added); *see also Lyons v. United States,* 221 A.2d 711 (D.C.App.1966) (pre-*Terry* probable cause case) (holding that defendant's association with a known narcotics user, who in fact possessed narcotics at the time of his arrest, did not constitute probable cause).

■ The first factor, standing alone, would be insufficient to pass Fourth Amendment muster. Indeed the government does not contend otherwise.

The second factor—the absence of other persons in the immediate vicinity of the two suspects—is merely a sub-set of the first factor. To give validity in any measure to the first factor, one would have to consider the number of persons conversing with or in the immediate vicinity of the drug suspects. This second factor, in fact, adds little, if anything, to the first factor.

The third factor urged by the United States is Officer Lawson's knowledge that drug sales are often made in a team. The inference in this case that a reasonable police officer could rationally draw from this knowledge has limitations. Smith was not present at the drug transaction reported by the undercover agent. The radio call which subsequently went out contained no description of anyone resembling Smith. Officer Lawson testified that he suspected Smith may have been the "juggler" or "money person," a member of a drug distribution team who may not be present at the actual transaction. But neither Lawson nor any other officer saw Smith handle money or make any other movement or gesture which might have indicated he was the money man. *Compare United States v. Bennett, supra* (officers observed one man accepting Lawson's money from another and saw appellee stick his hand into his waistband). The reasonableness of suspicion is further weakened by the presence

---

**5.** We recognize that the burden on the government under the *Terry* standard is less than the probable cause standard. *See Dunaway v. New York,* 442 U.S. 200, 207–11, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

**6.** Courts have likewise rejected probable cause arguments based upon guilt by association. *See, e.g., People v. Martin,* 32 N.Y.2d 123, 125, 296 N.E.2d 245, 246, 343 N.Y.S.2d 343, 345

(1973) ("mere presence at a narcotics transaction did not constitute probable cause"); *Commonwealth v. Platou,* 455 Pa. 258, 312 A.2d 29 (1973) (no probable cause for search of property belonging to other persons who happen to be present on premises being searched pursuant to warrant), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).

of other persons in the parking lot, any one of whom may have been the money man.

Similarly, the fact that the activity occurred in a high drug trafficking area has, in some of our cases, been taken into account in determining the reasonableness of the officer's suspicion. *See, e.g., Price v. United States,* 429 A.2d 514, 518 (D.C.App. 1981). However, we have been careful to emphasize that "[t]his familiar talismanic litany, without a great deal more, cannot support an inference that appellant was engaged in criminal conduct." *In re D.J.,* 532 A.2d 138, 143 (D.C.App.1987) (quoting *Curtis v. United States,* 349 A.2d 469, 472 (D.C.App.1975)). For "it is necessary to remind again that thousands of citizens live and go about their legitimate day-to-day activities in areas which surface ... in court testimony, as being high crime neighborhoods. The fact that the events here at issue took place at or near an allegedly 'high narcotics activity' area does not objectively lend any sinister connotation to facts that are innocent on their face." *Bennett, supra,* 514 A.2d at 419 n. 3 (Mack, J., dissenting); *see also Hemsley v. United States,* 547 A.2d 132, 134 (D.C.App.1988) ("Appellant's sitting with two others in a parked car with the windows rolled up and a lot of smoke inside 'is not sufficiently suspicious'—even in a 'high crime' area—to warrant an investigative seizure of the person.") (quoting *United States v. Barnes,* 496 A.2d 1040, 1043 (D.C.App.1985)); *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.")

We note, in addition, that where the suspected criminal activity is drug dealing, based on a purchase by an undercover police officer, to give significant weight to the character of the neighborhood as an additional factor seems of doubtful validity.

In our view, the preceding four factors, taken collectively, fall short of constituting "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a Fourth Amendment intrusion. *Terry, supra,* 392 U.S. at 21, 88 S.Ct. at 1880 (footnote omitted). Thus, we must evaluate the so-called "flight" factor in this case and determine whether it adds enough to the total calculus to make the seizure valid. We have recognized, "as a general proposition that flight from authority—*implying consciousness of guilt*—may be considered among other factors justifying a *Terry* seizure." *Johnson, supra,* 496 A.2d at 597 (emphasis added) (citing *Stephenson v. United States,* 296 A.2d 606, 609–10 (D.C. App.1972), *cert. denied,* 411 U.S. 907, 93 S.Ct. 1535, 36 L.Ed.2d 197 (1973)).[7] However, it is obvious that flight cannot imply consciousness of guilt in all cases. *Hemsley v. United States, supra,* 547 A.2d at 134. Leaving a scene hastily may be inspired by innocent fear, or by a legitimate desire to avoid contact with the police. A citizen has as much prerogative to avoid the police as he does to avoid any other person, and his efforts to do so, without more, may not justify his detention. *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion) (a person approached by a police officer "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way...."); *Brown v. Texas, supra; In re D.J., supra,* 532 A.2d at 142–43.

To provide grounds for suspicion, therefore, "the circumstances of the suspect's efforts to avoid the police must be such as 'permit[ ] a rational conclusion that flight indicated a consciousness of guilt.'" *In re D.J., supra,* 532 A.2d at 141 (quoting *Lawrence v. United States,* 509 A.2d 614, 618 (D.C.App.1986) (Newman, J., dissenting)); *Johnson, supra,* 496 A.2d at 597. Typically, in those cases in which we have found that flight indicated a consciousness

---

7. We have never, however, sustained a *Terry* stop on the basis of flight from the police *alone.* "For flight is not 'a reliable indicator of guilt without other circumstances to make its import less ambiguous.'" *Johnson, supra,* 496 A.2d at 602 (Mack, J., dissenting) (quoting *Hinton v. United States, supra,* 137 U.S. App.D.C. at 391, 424 F.2d at 879).

of guilt, the accused clearly knew that the police were present and reacted by immediately running from the scene of the alleged crime. *See, e.g., Bennett, supra,* 514 A.2d at 414 (appellant and companion "bolted" when police car arrived); *Tobias v. United States,* 375 A.2d 491, 492 (D.C.App.1977) (appellant began to run when police officer identified himself as such); *Hinton, supra,* 137 U.S. App.D.C. at 391, 424 F.2d at 879 (appellant "bolted" after police searched his companion and found contraband).

In several important respects, Smith's conduct after the arrival of the police did not fit the paradigm, as outlined in the above cases, of flight indicating consciousness of guilt. First, at no time did Smith "bolt" or run; at most, he walked at a fast pace. Officer Lawson testified that when his arrest team of plainclothes officers arrived in the parking lot where the drug sale had taken place and began to get out of their unmarked car, Smith and his companions began to disperse. Smith *walked* past the unmarked car and continued out of the driveway leading from the parking lot. When Officer Lawson then called to him to stop, and (according to his testimony) identified himself as a police officer, Smith (although stopping briefly and stating he had nothing to do with the other men) continued to *walk at a fast pace* until Lawson put his hand on his shoulder, making the *Terry* stop.

Of at least equal importance, there was no basis for the officer to draw a rational and reasonable belief that Smith himself believed they were police officers. The officers were dressed to blend into the environment so as to conceal their identity as police officers. Officer Lawson did not identify himself to Smith as an officer until moments before the seizure and after Smith had already begun leaving the scene at a fast pace. The government points to two circumstances which it contends make Lawson's belief about flight appropriate. Lawson testified that his police badge was on his belt and his service revolver was on his waist. However, Lawson testified he had on a coat; there was no evidence that the coat was open. Specifically, there was no evidence from which one could conclude that Lawson rationally and reasonably be-

lieved that Smith saw his badge or service revolver before Lawson identified himself to Smith as a policeman. The government's second contention is that Lawson could rationally and reasonably believe that Smith believed it was the police arriving in the vehicle because it was an unmarked car of a particular color in a particular neighborhood with four people inside. In essence, the government says, Lawson could rationally and reasonably believe that Smith recognized the officers as an arrest team—a so-called "jump-out" team. The record is totally devoid of any evidence which would support a rational and reasonable belief as to Smith's knowledge that they were police officers. Nevertheless, the government would have us conclude that when a sufficiently high percentage of people in some neighborhoods may recognize jump-out squads, an officer can rationally and reasonably conclude that one particular person has made such an identification. For reasons similar to those causing us to reject associational taint, we reject this notion of locational taint whereby an individual's behavior is explained by reference to what others in that area or neighborhood may know about the arrest procedures of the police department.

■ In sum, the circumstances of Smith's departure upon the arrival of the car at a "fast clip," when coupled with the absence of evidence on which one could rationally and reasonably believe that Smith recognized the arrival of police, deprive the fifth factor ("flight") of any impact in the Fourth Amendment equation.

We hold there were insufficient "specific and articulable facts ... taken together with rational inferences from those facts," *Terry, supra,* 392 U.S. at 21, 88 S.Ct. at 1880, (footnote omitted), to give constitutional validity to the seizure in this case.

*Reversed.*

FERREN, Associate Judge, with whom ROGERS, Chief Judge, and MACK, NEWMAN and TERRY, Associate Judges, join, concurring in the opinion of the court:

Two minutes after a reported narcotics transaction, Officer Lawson—who was

driving an arrest team in an unmarked police cruiser—saw two individuals who matched a lookout description of the suspects conversing with another individual in a parking lot at 12th and U Streets, N.W. The officer pulled the car into the driveway of the lot. As the four officers began to exit their vehicle, the three individuals in the lot began to disperse. According to Officer Lawson, appellant Smith, the man who had been talking with the two suspects, moved toward the parked car at a pace between a walk and a run on his way out of the lot. Lawson believed Smith "might have been involved in the transaction" as the "money person" because he had been talking with the two suspects and began to leave at a "fast pace" when Lawson pulled up and stopped the car. Lawson had reason to believe Smith recognized the unmarked vehicle as a police cruiser, he said, because "in that particular area, we go through quite frequently and we are also known by the colors of our cruisers and the fact that it is usually three to four people in the cruiser and usually whenever we come into the area, there is always a person that announces the fact that we are there." Accordingly, as Smith headed away from the lot up the sidewalk along 12th Street, Officer Lawson "announced" he was a police officer and told Smith to "stop." Smith did so and told Lawson "he had nothing to do with these people" in the parking lot. Smith then "attempted to walk continuing north," but Lawson physically restrained him "[b]y placing my left hand on his shoulder."

Officer Lawson effected a so-called *Terry* stop[1]—an investigative seizure—at the time he made a show of authority and ordered Smith to "stop." *See United States v. Johnson*, 496 A.2d 592, 594–95 (D.C.App.1985); *In re J.G.J.*, 388 A.2d 472, 474 (D.C.App.1978). The seizure did not occur later, as the government argues, when Officer Lawson physically restrained Smith. Thus, Smith's arguably inculpatory statement—he "had nothing to do with these people"—cannot serve as a basis for the *Terry* seizure here; he made the statement after the seizure had occurred.

The question, then, is whether Officer Lawson, at the time he ordered Smith to "stop," had "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *see also United States v. Bennett*, 514 A.2d 414, 415–16 (D.C.App.1986). Put another way, did Officer Lawson have "a reasonable suspicion, based on objective facts, that the individual [was] involved in criminal activity"? *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979).

Evaluation of Officer Lawson's behavior must deal with the totality of what he observed. *Bennett*, 514 A.2d at 416 (citation omitted). I began with the most direct evidence: Officer Lawson saw Smith conversing with two others who fit a lookout description for a narcotics transaction broadcast two minutes earlier. This conversation in itself could well have served as a basis for the police to approach Smith for questioning if he had been willing—a so-called "consensual encounter," *see United States v. Barnes*, 496 A.2d 1040, 1043–45 (D.C.App.1985). The conversation without more, however, did not justify a *Terry* seizure because it would have been based solely on guilt by association, which is not enough. *See Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979); *People v. Ballejo*, 114 A.D.2d 902, 904, 495 N.Y.S.2d 75, 77 (1985).

But Officer Lawson says there was more: he suspected appellant might have been the "money person" in a kind of narcotics transaction known to involve up to four persons on occasion. The problem here, however, is that until appellant began to leave the scene when the police arrived, there was no reasonable, objective basis for Lawson's suspicion about a "money person" other than appellant's mere association with the suspects. There were no gestures or other actions that indicated any transaction among the three beyond mere

---

**1.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20   L.Ed.2d 889 (1968).

conversation. There was nothing as yet to confirm Lawson's suspicion.

The fact that other persons were in the parking lot, standing away from the three men who were conversing, adds nothing if the conversation itself was not sufficient for an investigative seizure. There is no indication that anyone else was involved with the three. Nor can any inference reasonably be drawn from the fact that the three men were not mingling with the others. Officer Lawson admitted, in fact, that it was possible one of the others in the lot might have been the "holder of the money." Lawson's focus on appellant, therefore, amounted to a hunch at best.

The fact that the parking lot was located in a so-called high narcotics area also is irrelevant under the circumstances. The police already had probable cause to arrest the two suspects whose descriptions they had received from the radio lookout, so the neighborhood adds nothing to the case against them. Nor can the general nature of the neighborhood reasonably be used, any more than the association with the suspects themselves, to enhance police suspicion that appellant in particular was the "money man." I join my colleagues in the majority in refusing to brand anyone with a "locational taint" that makes him subject to a lawful seizure when, if seen in another neighborhood, he would not be.

The case, therefore, comes down to whether appellant's attempt to leave the scene, when added to his observed conversation with the two suspects, was enough to create a "particularized and objective basis" for the seizure. *Cortez,* 449 U.S. at 417, 101 S.Ct. at 695. We have "recognized the 'general proposition that flight from authority—implying consciousness of guilt —may be considered among other factors justifying a *Terry* seizure.'" *Bennett,* 514 A.2d at 416 (quoting *Johnson,* 496 A.2d at 597) (footnote omitted). But use of flight in this way presupposes two findings: (1) the party leaving the scene knows he is fleeing from police officers, and (2) the

manner of flight suggests consciousness of guilt rather than a mere desire not to interact with the police—which is anyone's right absent a valid seizure. *See In re D.J.,* 532 A.2d 138, 141–42 (D.C.App.1987).

The latter issue is easily disposed of. If the police do not otherwise have a legitimate basis for a *Terry* stop, and if a person wants to exercise the right not to speak with an approaching police officer, then the fact that the person chooses to leave the scene, even at a brisk pace, cannot reasonably arouse suspicion. There are many legitimate reasons why anyone might want to avoid an encounter with the police.[2] The exercise of that right, therefore, should not be allowed to create the basis for a seizure that otherwise would not be lawful. For flight to suggest consciousness of guilt—a mentality other than a legitimate desire to avoid the police—that flight not only must be very clearly in response to a show of authority but also must be carried out at such a rate of speed, *see id.* at 141 (citing cases), or in such an erratic or evasive manner that a guilty conscience is the most reasonable explanation. Smith's departure from the scene at a "fast pace" between a walk and a run does not meet that test.

But there is even a more fundamental reason why Officer Lawson could not rely on Smith's flight to help justify the seizure: the record does not demonstrate clearly enough that, as of the time of the stop, Lawson could reasonably believe that Smith knew Lawson and his colleagues were the police instead of, for example, a gang of fast-driving toughs. Smith had already begun to leave the parking lot as Lawson and the others exited their car. The record could not sustain a finding, therefore, that Smith must have left because he saw a gun, or handcuffs, or a badge that indicated the men and women in plain clothes, in an unmarked cruiser, were the police. The dissenters apparently agree, for they acknowledge that, under

---

2. In *In re D.J.,* we said: "An individual may be motivated to avoid the police by a natural fear or dislike of authority, a distaste for police officers based upon past experience, an exaggerated fear of police brutality or harrassment, a fear of being apprehended as the guilty party, or other legitimate personal reasons." 532 A.2d at 142 n. 4.

the circumstances, certain testimony indicating that Officer Lawson's badge and revolver may have been visible as he left the car amounted to "a relatively inconsequential matter." *Post* at 325.

The real issue, therefore—the issue that decides this case and divides the court—is whether the record would sustain a finding that Officer Lawson reasonably could believe that Smith knew Lawson and the others were police officers for another reason: "in that particular area," according to Lawson, undercover police are "known by the colors of our cruisers," by the fact that there are "usually three to four people in the cruiser," and by the fact that "there is always a person that announces" the police are there. I find the record devoid of probative evidence to support this belief.

In the first place, Lawson's belief is premised on Smith's being from the "particular area" and presumably knowing what goes on there. Lawson, in fact, had no basis for knowing where Smith lived. And it is unsound to suggest, as the dissenters would have it, that anyone is presumptively from a "particular area" if, for example, he is not carrying a suitcase or happens to be standing in a parking lot instead of moving down the street.

Second, I do not believe the government can rely solely on Officer Lawson's own broad statements about what is generally known and "always" announced in a neighborhood to establish that his beliefs were reasonable. It is farfetched to believe that

everyone in a particular area knows these things and is alerted to undercover police on every occasion. The government did not even attempt to corroborate Lawson's perceptions—and thus bring them to the level of reasonableness—by calling witnesses to back him up. The dissenters identify three trial witnesses who tend to confirm some of what Officer Lawson said. One of these witnesses was a suspected drug dealer; another, pending hearing on a drug charge at the time of her testimony, had been arrested twice at 12th and U Streets, N.W., by arrest squads similar to Officer Lawson's; and the third had also previously been arrested at this same location. That the knowledge of these particular individuals should be used to establish the standard for judging what everyone in that area should be deemed to know is altogether untenable.

Untenable, that is, unless we tolerate the branding of particular neighborhoods, and everyone who goes into them, as examples of cultures apart from the rest of our community—as neighborhoods where everyone is more suspect because they live there, and where everyone can be expected to know all the ins-and-outs of criminal activity and police responses. Naive I may be in believing that not everyone in so-called high crime areas is altogether savvy about, if not a part of, the criminal milieu. But the fallacy of that belief has never been demonstrated to my satisfaction and certainly has not been shown on this record.[3]

---

3. Judge Belson, in dissent, makes much of a distinction he perceives between the concepts of a "particular area" and of a "neighborhood." He states that Officer Lawson could have reasonably believed that people congregating in a "'particular area,' the area around 12th and U Streets, N.W.," *post* at 326, would recognize an unmarked police car, even if the officer could not have reasonably believed that citizens living and working "in that general vicinity" would recognize his cruiser. *Post* at 327. I disagree; on this record, the distinction between "particular area" and "general vicinity" is not evident. In the first place, Officer Lawson's testimony that unmarked cruisers frequently travel "through" the "particular area" where appellant was observed, and that undercover police are recognized and usually "announce[d]" in "the area," did not necessarily refer only to the immediate environs of 12th and U Streets, N.W.

Thus, the record does not assuredly confine Lawson's belief about public recognition of undercover police to a narrowly circumscribed location. Second, the government never pressed such a distinction. In questioning a trial witness on whom Judge Belson relies for the proposition that undercover police could reasonably anticipate being recognized in this "particular area," the prosecutor asked: "But you didn't have any doubt in your mind that the police had just come in to the *neighborhood*?" *Post* at 327 n. 6 (emphasis added). Third, I make no distinction in this concurring opinion between the terms "area" or "particular area" and "neighborhood" because our case law does not do so and there is no clear indication Officer Lawson actually intended a narrower definition of "particular area" than is commonly meant by "neighborhood." This court has equated an "area notorious for a high degree of

So far as one can tell from the evidence, Officer Lawson premised his seizure of Smith on suspected guilt by momentary association with two suspects whom he had probable cause to arrest, coupled with an unreasonable belief that Smith was leaving the parking lot because of a guilty conscience. That does not suffice. Accordingly, I vote to reverse.

BELSON, Associate Judge, with whom STEADMAN, Associate Judge, and REILLY and PRYOR, Senior Judges, join, dissenting:

I share the majority's concern that the threshold requirement for *Terry*[1] stops should not be set so low that a person's neighborhood or choice of friends would itself provide a basis for police stops or seizures. The majority opinion, unfortunately, distorts that concern into a holding that may hamper reasonable and effective police work. My purpose in writing is to show that the Constitution does not require the result which the majority erroneously thinks it requires.

At the outset, I emphasize, as the majority acknowledges, that *"Terry* compels us to evaluate the totality of the circumstances constituting articulable suspicion." Majority opinion at 314. "[I]n judging the reasonableness of the actions of the officer the circumstances before him are not to be dissected and viewed singly; rather they must be considered as a whole." *United States v. Hall,* 174 U.S.App.D.C. 13, 15, 525 F.2d 857, 859 (1976). "Based upon th[e] whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101

S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). *See also United States v. Sokolow,* —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *United States v. Bennett,* 514 A.2d 414, 416 (D.C.App.1986).

The essential error of the majority's analysis, I submit, is that it fails to give sufficient weight to the totality of what the experienced arresting officer knew and observed. This failure is due in part to the majority's mistaken refusal to give any weight to the fact that appellant attempted to flee from the scene of a recently concluded drug transaction, and to its failure to acknowledge the force of probative evidence that the arresting officer was aware that unmarked police vehicles used in undercover operations were generally recognized by persons in the high narcotics area in question. But more damaging than these particular errors is the majority's approach of subjecting to exacting scrutiny each factor known to the arresting officer while paying no more than lip service to the principle that a police officer must act on the totality of what he knows when he makes difficult judgments in a fast-moving situation.

To put these dispositive deficiencies of the majority opinion into context, I review the salient facts.

Officer Lawson, the arresting officer, had been with the Metropolitan Police Department for 16 years, had been engaged in narcotics work for 6 years, and had made over 200 narcotics arrests. At the time of the incident in question, Officer Lawson was working as an undercover officer, sometimes purchasing narcotics, at other times serving as a member of a back-up team arresting persons who made narcotics

---

narcotics use" with a "neighborhood of high narcotics activity," *Price v. United States,* 429 A.2d 514, 515, 518 (D.C.App.1981), and we have noted that "[t]housands of persons live and go about their legitimate business in areas which are denoted 'high narcotics areas' by police." *In re D.J.,* 532 A.2d at 143 (citing *Brown v. Texas,* 443 U.S. at 52, 99 S.Ct. at 2641 (referring to "neighborhood frequented by drug users")). Accordingly, unless a police officer more specifically circumscribes the geographical area he is talking about, his imprecise references to a "particular area" presumably embrace a "neighbor-

hood." If, as the dissenters would have it, a "particular area" is smaller than a "neighborhood," and if the residents and visitors in the former but not in the latter can be deemed conversant with undercover police responses to criminal activity, then I believe the government has the burden of defining terms and showing more precisely than it did here the basis for the evidentiary inference.

1. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

sales to other undercover officers. Officer Lawson was aware that narcotics sales are made by teams of as many as four persons. Typically, those persons have certain roles: one serves as the runner who makes contact with the potential buyer; another is the holder who holds the narcotics; another is the money man who takes possession of the money after a sale is made; and a fourth person is sometimes used as a lookout.

The area where the incident occurred was a high narcotics area, known as a place where preludin was sold. From his lengthy experience as an undercover officer doing narcotics work, Officer Lawson had learned that "in that particular area" undercover police officers were known by the colors of their cruisers, and by the fact that there are usually three or four persons in the cruiser; he also knew that when police officers came into that area, some person would usually announce the fact that they had arrived.

On the day in question, Officer Lawson was serving in an undercover capacity as a member of the arrest team that was to move in after another undercover officer had made a purchase using marked money. He received a "lookout" from the undercover officer who had made a purchase in a parking lot at 12th and U Streets. The undercover officer gave a description of two persons who had just sold him narcotics. The undercover officer had used "prerecorded MPDC funds" in the purchase of the narcotics from the two suspects. Thus it was important to the government's case against the two original suspects to see that the marked money was not taken from the scene.

Officer Lawson then drove an unmarked police car at a fast clip into the driveway which led to the parking lot where the sale had just occurred, arriving there within about two minutes. Three other undercover officers were in the car with Officer Lawson. Officer Lawson and his colleagues entered the parking lot for the purpose of arresting the two individuals who had just sold the narcotics.

When Officer Lawson pulled the car into the entrance of the parking lot, he observed three persons conversing. One was appellant, the other two matched the descriptions given by the other undercover officer who had just made a buy. The only other persons around were "over on the other side of the parking lot." As the police exited their vehicle and started into the lot, appellant moved away from the two suspects identified by the undercover buyer, and began to leave the parking lot. He moved at a "fast pace." "It was more than a walk, and not a run."

At the time he emerged from his vehicle, Officer Lawson had his police badge clipped to his belt. He also had handcuffs and his service revolver. The badge was visible, if his jacket was open. According to the officer, "My service revolver, any time that I come out, it is visible." Officer Lawson identified himself to appellant as a police officer, and told appellant that he should stop. Appellant stopped, turned and faced the officer, and then said that "he had nothing to do with the people inside the lot," a statement that could reasonably be taken as conveying some awareness of the criminal behavior that the other two had engaged in a few minutes earlier. When appellant tried to move farther, Officer Lawson attempted to stop him by placing his hand on his shoulder. Officer Lawson wanted to stop appellant "[b]ecause at the time I felt that he might have been involved in the transaction." Officer Lawson "felt that he might have in this case been the money person."

I disagree with the majority that the foregoing facts, viewed in their totality, did not afford Officer Lawson a reasonable and articulable basis for stopping appellant for further investigation. A discussion of the majority's analysis of the facts will make plain the reasons for our disagreement.

The majority sees in the government's presentation five factors advanced to justify the stop. The majority discusses the first four, *seriatim*, and concludes that collectively they do not justify the stop. It then examines the fifth, appellant's flight,

and concludes it is entitled to no weight at all. My differences with the majority's analysis begin with its treatment of the first four factors. The majority identifies those factors as follows:

(1) appellant was engaged in a conversation with two men who less than two minutes before had been the subjects of a radio run for a narcotics transaction;

(2) no other persons were in the immediate area;

(3) the experienced police officer was aware that narcotics sales are often made by several persons working as a team;

(4) the neighborhood was a high narcotics trafficking area.

Majority opinion at 314.

Addressing the first factor, I suggest that the observation of appellant in conversation with the two suspects, a brief two minutes after the radio run identifying the pair as participants in a narcotics sale, was a factor to which a police officer could reasonably accord considerable weight. The lookout for the two other men distinguishes this case from one in which police on routine patrol view suspicious activity in a parking lot or on a sidewalk. The information complements the other factors the government relies on, especially the police officers' observation that no other persons were around and their knowledge of how narcotics sales are made by persons working as a team. Thus, the first factor was a circumstance that helped to point a finger of suspicion directly at appellant.

The majority would disparage the impact of appellant's association with the two suspects by invoking the term "guilt by association." In doing so, the majority takes the sound concept that one cannot be deemed guilty of any criminality merely because of association with other persons, and turns it on its head, converting it into a prohibition against considering one's associations in determining whether there was a reasonable and articulable basis for suspecting that one had engaged or was engaging in criminal activity. To do so is legally and logically insupportable. As Justice Douglas observed, concurring in the judgment of the Supreme Court in *Sibron v. New York*, 392 U.S. 40, 68, 88 S.Ct. 1889, 1905, 20 L.Ed.2d 917 (1968), "[c]onsorting with criminals may in a particular factual setting be a basis for believing that a criminal project is underway. Yet talking with addicts without more rises no higher than suspicion. That is all we have here...."

Appellant, as we develop here, did far more than talk with persons who were addicts. Indeed, by attempting to draw support from the Supreme Court's holding in *Sibron*, majority opinion at 314, the majority calls attention to a strength of the government's case here, and exposes a fundamental weakness in the majority's own analysis. There is a basic distinction between *Sibron* and this case. Police officers came to suspect Nelson Sibron of a narcotics offense on the basis of no more than his conversing, over a period of several hours, with six or eight persons whom the officers knew from past experience to be narcotics addicts. The Supreme Court held that "the inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security." 392 U.S. at 62, 88 S.Ct. at 1902.

The situation in the case before us was far different. Here the two individuals with whom appellant was conversing as the police arrived were not persons known to the police to be drug addicts; they had not drawn the attention of the police because of their status; rather, they were individuals who were suspected of having committed a specific criminal act a few minutes earlier, and the violation of law of which they were suspected—the sale of narcotics—was known to the arresting officer as a criminal transaction of a type that would frequently include among its perpetrators a third individual whose role would be to serve as "money man," a person who would serve as a floating bank and would take the receipts of a sale away from the

scene of the transaction.[2] It is the difference between this case and *Sibron* that requires that the first factor be given substantial weight in the *Terry* analysis.[3]

The majority dismisses the second factor that it identifies in the government's position—that no other persons were in the immediate area when the police spotted the two suspects—with the observation that this factor is "merely a sub-set of the first factor" which "adds little, if anything, to the first factor." Majority opinion at 315. Once again, the majority attempts to minimize what an experienced officer could glean from the circumstances. The fact that the only other persons around were "over on the other side of the parking lot" suggested that if the two suspects identified by the purchasing undercover officer were using a money man or other confederate, that person was more likely appellant than some other individual at or near the scene. The fact that two minutes had elapsed since the radio run does not negate a suspicion that appellant was the money man, because there could be myriad reasons why he would relieve the seller of the money a few minutes, as opposed to a few seconds, after the sale.

The third interrelated factor which the majority identifies in the government's position is that the officers knew that drug sales were often made by several persons working as a team. The majority first comments that the inference that a reasonable officer could draw from this knowledge has limitations, noting that Smith was not present at the drug transaction reported by the undercover officer. But a money man, one can fairly assume, would not be standing there during the transaction.

The majority goes on to observe that no officer saw Smith handle money or make any other movement or gesture which indicated that he was the money man. While

this is the state of the record, it is also true the officers who arrived on the scene had but a brief time to observe the two described suspects and appellant before appellant began to leave. This is not a case where officers conducted surveillance from an observation place. So it is not surprising that the officers did not see him make any incriminating gestures. While there were no telltale gestures that added to the grounds for suspicion, their absence under the circumstances does not detract from the significance of the other indicia present.

As to the fourth factor, that these events occurred in an area known for high narcotics activity, the majority grudgingly concedes this factor has been taken into account "in some of our cases," majority opinion at 316, but goes on to state that this factor cannot support an inference of criminal conduct without a great deal more. The majority adds that it seems of doubtful validity to give significant weight to the character of the neighborhood where the suspected activity of drug dealing is based on a purchase by an undercover police officer. Once more, the majority labors to minimize the inferences that an experienced officer can draw from the way persons conduct themselves in a drug-dealing locale. This is not a case of stopping a person just because he was standing around talking to two others in a drug-plagued part of the city. The officers were moving in quickly on two persons who had just sold drugs to an undercover officer. The fact that these events took place in a known preluding sales area was certainly something the officers could consider when they observed the appellant's conduct. It deserves better than to be dismissed as a "familiar talismanic litany."

At this point in its analysis, the majority assesses the first four factors it identifies

---

**2.** These facts also distinguish the case from *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), cited by the majority.

**3.** The majority concludes its discussion of the first factor with the observation that the government does not contend that this factor, standing alone, would be sufficient to pass Fourth Amendment muster. Even assuming that it

would not be sufficient, the authorities cited and quoted above make it abundantly clear that it is unimportant whether one of the many factors to be considered in a *Terry* analysis is of itself sufficient to support a stop. It is the totality of the circumstances to which we must look.

in the government's argument, and finds them wanting. It then goes on to examine what it considers the final factor, appellant's flight, without referring to a consideration which I deem very important: that is, that the police knew that persons in that locality generally recognized police cruisers and police tactics and that those persons who are involved in narcotics dealings would know enough to disperse quickly when the police arrived. I will address that factor here, because logically it precedes the factor of appellant's flight, which an officer could have inferred was caused directly by appellant's consciousness of the approach of law officers.

Although the majority does not list the arresting officer's knowledge or belief in this respect as a factor, it does mention it, and says that "[t]he record is totally devoid of any evidence which would support a rational and reasonable belief as to Smith's knowledge that they were police officers," majority at 317, and that there was "no basis for the officer to draw a rational and reasonable belief that Smith himself believed they were police officers." Majority opinion at 317. In support of its statement, the majority notes that the undercover officers were dressed to blend into their environment and that Lawson did not identify himself as an officer until moments before the stop, after Smith had begun to leave the scene at a fast pace.

The majority opinion then deals with the two circumstances which, it says, the government contends made "Lawson's belief about flight appropriate." Majority opinion at 317. The first dealt with Lawson's wearing a police badge on his belt and a service revolver on his waist. Commenting that there was no evidence that Lawson's coat was open, the majority states that there was no evidence from which one could conclude that Lawson rationally and reasonably believed that Smith saw Lawson's badge or service revolver before Lawson identified himself to Smith as a policeman. This conclusion by the majority ignores Lawson's testimony that "my service revolver, any time that I come out, it is visible." As I read the record, Lawson's statement was made flatly, and

was not conditioned, as was the visibility of his badge, on the assumption that his jacket was open. But this is a relatively inconsequential matter, because it is obvious from the record that Lawson had already determined that appellant, because of his reaction to the arrival of the police vehicle on the scene, should be stopped before he could flee the scene.

This leads us to the majority's discussion of what it identifies as the second government contention relating to flight. The majority states that "the government would have us conclude that when a sufficiently high percentage of people in some neighborhoods may recognize jumpout squads, an officer can rationally and reasonably conclude that one particular person has made such an identification." Majority opinion at 317. The majority explains its rejection of the government's position by saying "[f]or reasons similar to those causing us to reject associational taint, we reject this notion of locational taint...."

What the majority rejects here is not simply the argument of government counsel. It is the testimony of a sixteen-year veteran of the Metropolitan Police Department, an officer with a wealth of experience in trying to combat drug trafficking in our city, that in the particular area in question, around 12th and U Streets, N.W., undercover police officers like himself who go through that area "quite frequently" are "known by the colors of their cruisers and the fact that it is usually three to four people in the cruiser." And the majority would also write off the experienced officer's testimony that "usually whenever we come into the area, there is always a person who announces the fact that we are there." The majority argues that police officers cannot rationally and reasonably "believe" that a particular individual has identified them as police from the fact that officers are so generally recognized in that "neighborhood" that when they arrive on a scene, their arrival is usually announced by somebody already there. But why is it not reasonable and rational to "believe" (or, more accurately, under *Terry*, "suspect") this and to do so in the case of this appel-

lant?[4] There was no indication that he was a traveler from some other place, *e.g.*, carrying a suitcase, nor was there any indication that he was a person who was just passing through. He was not merely walking down the sidewalk. He was standing within the recesses of a parking lot at about 5:30 p.m. on a March evening. It was certainly reasonable under the circumstances to suspect, and even to think it likely, that appellant was familiar with the area in which he was standing. Accordingly, when appellant reacted to the police arrival as a person familiar with the particular area would, if he were dealing in narcotics, the police had reason to suspect that he did so because he recognized the jump-out squad.[5]

I observe that the majority opinion and the concurrence both use the term "neighborhood" frequently in analyzing this aspect of the case, while Officer Lawson spoke of jump-out squads being recognized in this "particular area," the area around 12th and U Streets, N.W. The difference between the terms "particular area" around 12th and U and "neighborhood" may seem trivial, but the majority and the concurring statement of Judge Ferren introduce the term "neighborhood," one freighted with meaning in current idiom, and then use it as a springboard for discussions of what they call "locational taint." The majority argues against a theory that

an officer can reasonably and rationally conclude that one particular person, *e.g.*, appellant, has identified arriving officers as police when "a sufficiently high percentage of people in ... [the] neighborhood may recognize jump-out squads." The concurrence speaks of "the branding of particular neighborhoods, and everyone who goes into them, as examples of cultures apart from the rest of our community—as neighborhoods where everyone is more suspect because they live there, and where everyone can be expected to know all the ins-and-outs of criminal activity and police responses." Concurrence at 320.

Such concerns are misplaced. Officer Lawson's testimony did not brand any neighborhood, implicitly or explicitly. Nor does this dissent. The question is not whether the stop took place in a "neighborhood" in which "everyone can be expected to know" about the officers' arrival as a jump-out squad, as Judge Ferren's concurrence puts it. Concurrence at 320. It is whether it was reasonable under the circumstances for a police officer to suspect that a person standing in a parking lot near the intersection of 12th and U Streets, N.W., a known drug peddling location, recognized the arriving police unit.

The reasoning of the concurrence would prevent the police from acting on reasonable suspicion concerning the activity of a person in a drug trafficking locale because

---

4. It is unreasonable to require the officers to presume that appellant was not familiar with the immediate area in which appellant was not familiar with the immediate area in which he was standing, but this is the purport of Judge Ferren's concurrence. Concurrence at 320.

5. It is worth emphasizing that it is the reasonableness of the suspicion entertained by Officer Lawson that matters, not what appellant may or may not have thought about the arrival of the police. *See, e.g., United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) ("the detaining *officers* must have a particularized and objective basis for *suspecting* the particular person stopped" (emphasis supplied)); *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) ("we have required the officers to have a reasonable *suspicion,* based on objective facts, that the individual is involved in criminal activity" (emphasis supplied)); *United States v. Johnson,* 496 A.2d 592, 597 (D.C.App.1985) (considering what

"[u]nder the circumstances, the *officers* reasonably could conclude" (emphasis supplied)). As this court stated in *Franklin v. United States,* 382 A.2d 20 (D.C.App.1978), in which we upheld the trial court's curtailment of cross-examination on the question of whether the accused did in fact know the persons in the undercover car were police officers, "[a]ppellant['s] knowledge ... is immaterial to the issue of police reasonableness where, as here, there was a sufficient basis for the trial court's conclusion that the police officers reasonably believed appellant[ ] to have known that they were police officers." *Id.* at 22 n. 3. *See also Bennett, supra,* 514 A.2d at 416. Indeed, as the Eighth Circuit has stated, officers' observations giving rise to articulable suspicion "must be viewed through the eyes of persons who, like the agents in this case, are trained to cull significance from behavior that would appear innocent to the untrained observer." *United States v. Poitier,* 818 F.2d 679, 683 (8th Cir. 1987).

of a stated concern that to do so would necessarily brand all persons living in some undefined "neighborhood" as "altogether savvy about, if not a part of, the criminal milieu." Concurrence at 320. To the contrary, judicial acceptance of police (and civilian) testimony that undercover police cars are recognized when a jump-out squad arrives at a scene like the one at 12th and U Streets, N.W., does not "brand" all the citizens of any "neighborhood." It says nothing about all those who are going about their daily activities in or around their homes or places of business in that general vicinity.

It is ironic that a misplaced concern for the good repute of citizens who live near drug trafficking areas will result in a court holding that may limit police efforts to free those citizens from the scourge of illegal drug dealing.

On its way to rejecting the arresting officer's testimony about the perceptions of persons who frequented the area around 12th and U Streets, N.W., the majority indulges in an approach to *Terry* analysis

the Supreme Court cautioned against in *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), where it stated that "the evidence ... must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* at 418, 101 S.Ct. at 695. The officer spoke from long experience in dealing with the conduct of citizens in the areas where drugs are purveyed. And while it was not part of the record of the suppression hearing itself, testimony of witnesses called by the appellant at the trial on the merits of the charge before us attests to the accuracy of Officer Lawson's perceptions. This testimony, a part of the record before us, is worth more than volumes of scholarly conjecture about what an officer might rationally have suspected about a person in appellant's position, and it demonstrates that Officer Lawson could reasonably suspect that undercover police cars and the undercover officers in them were recognized as such when they arrived on a scene, as happened here.[6]

---

6. The following are excerpts of the testimony of appellant's witnesses. Joe Branch, one of the men with whom appellant was standing and whom police arrested in connection with the drug sale, testified as follows:

Q. And as soon as the police drew up you knew that it was the police. Right?
A. Yes.
Q. Okay. Because, you know—everbody knows, jump-out teams. Right?
A. Uh-huh.
          *     *     *     *     *     *
Q. But your testimony is as soon as those police move in everybody in the block knew the police were there. Right?
A. They started moving.
Q. Okay. And Mr. Smith started moving just because those police cars came in. Isn't that right?
A. Yeah. We started walking toward the gate. We just started walking, yeah.
Q. Now, and you moved because the police cars came in. Right?
A. Yeah.
          *     *     *     *     *     *
Q. Now, is it possible, Mr. Branch, Mr. Smith left you, saying that you gotta go about your business and he wanted to go about his business and started to walk away before the police officers came in?
A. No.
Q. It's not possible.

A. It ain't possible, no, because it didn't happen.

Jean Proctor, also a defense witness, was standing "in between the beginning of the parking lot and the middle way of the liquor store." Her testimony included the following:
(Direct)
A. What I observed that day, I was talking to someone and then I happened—there had to be a noise to make me turn around, and I turned around and looked, and I seen the police beating on the defendant.
Q. Now, you say you saw the police.
A. Well, as they call 'em, the jump-off [sic] squad.
Q. The persons you referred to, how were they dressed?
A. In jeans, shirts.
Q. Were they—can you tell us whether or not they were dressed in casual clothes or what?
A. Casual clothes. They wasn't in uniform.
          *     *     *     *     *     *
(Cross-examination)
Q. ... And you were talking to somebody there?
A. Yes.
Q. And the police drove in. Is that right?
A. Yes.
Q. And you recognized the police *when they drove in?*
A. Yes.
Q. You *recognized their car?*
A. Yes.

Judge Ferren's concurrence terms "altogether untenable" the proposition "[t]hat the knowledge of these particular individuals should be used to establish the standard for judging what everyone in that area should be deemed to know." Concurrence at 320. But, again, the concurrence misstates the issue. The officer did not act on a suspicion about what everyone in some undefined area is deemed to know. Officer Lawson acted in part on a reasonable suspicion that appellant whom he first saw standing within a parking lot at 12th and U Streets, an area known for drug trafficking, was able to recognize a jump-out squad. The testimony of those individuals who were standing in or near that lot at the time the jump-out squad arrived was highly probative of what police officers reasonably could suspect—not about all persons living somewhere in that general part of the city, but about persons who were standing in that parking lot near the corner of 12th and U Streets, N.W.

This brings us to the final factor, appellant's flight upon the arrival of the police. The majority concludes that this factor is entitled no "impact in the Fourth Amendment equation." I disagree. When Officer Lawson saw appellant conversing with the two persons who fit the description of

Q. People started moving away just like they always do when the police car come in?
A. [pause] Sometimes.
Q. And you recognized when they got out, you saw their guns and badges and stuff.
A. Some of 'em I did and some I didn't.
Q. But *you didn't have any doubt* in your mind *that the police had just come into the neighborhood.*
A. No. *That's true.*
Q. And they pulled into the gate of the parking lot.
A. Not only just the gate.
Q. Where did they pull in?
A. On the sidewalks.
(Emphasis supplied.)
Julia Carter, also a defense witness, gave similar testimony.

7. Judge Ferren's concurrence would adopt a sweeping general prohibition, unnecessary to the majority's stated basis for deciding this case, against giving weight in a *Terry* analysis to a flight effected like appellant's, *i.e.*, at a speed between a walk and a run but not "in such an erratic or evasive manner that a guilty conscience is the *most reasonable* explanation."

those who had just sold narcotics to an undercover officer, and then observed as appellant broke off the conversation and began to exit the parking lot hurriedly, at more than a walk but less than a run, it was entirely rational for him to suspect, as he did, that appellant was trying to get away quickly because he had something to do with the criminal transaction and that he indeed might be the money man who would carry the evidence from the scene if he were not stopped.[7] *See United States v. Johnson,* 496 A.2d 592, 597 (D.C.App. 1985) (flight one factor to consider among others justifying *Terry* stop). Officer Lawson's ensuing stop was, for the reasons expressed here, based on reasonable and articulable suspicion.[8]

Respectfully, I cannot join in an analysis which proceeds from a restrictive view of each of the factors relied upon by the experienced officer to a failure to acknowledge the significance of the totality of what that officer knew and observed. It would be a serious mistake to deprive our citizens of any of the protections of the Bill of Rights because of concern over the current epidemic of violent crime caused in large part by trafficking in illegal drugs. But it is at least as serious a mistake to adopt a prece-

(Emphasis added.) Concurrence at 319. It is inappropriate, I submit, to adopt any such general proscriptions in an area of the law where rulings must be very fact specific, and an almost infinite variety of sets of circumstances may come before the courts. Here, the circumstance that appellant was fleeing from the presence of two participants in a recent drug transaction in a drug trafficking locale strongly colored the officer's perception of the significance of appellant's flight, and made it reasonable to suspect that the reason for the flight related to a drug transaction.

8. When appellant volunteered before he was finally stopped that "he had nothing to do with the people inside the lot," he strengthened the already adequate basis for a stop. It is not necessary to decide here whether the officer's initial verbal request to appellant that he stop constituted a *Terry* stop, because what happened before afforded more than adequate grounds for such a stop. It would appear, however, that the officer's action was permissible under *United States v. Barnes,* 496 A.2d 1040, 1043–45 (D.C.App.1985), as a request for a consensual conversation, and did not amount to a stop.

dent that may hamper effective police action against drug traffickers when recognized principles of constitutional law dictate otherwise. I dissent.